HONORABLE MARSHA J. PECHMAN

Brian A. Knutsen, WSBA No. 38806
Kampmeier & Knutsen, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
Phone: (503) 841-6515

Paul A. Kampmeier, WSBA No. 31560
Kampmeier & Knutsen, PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Phone: (206) 223-4088 x 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, ) | No. 2:15-CV-01731-MJP |
| ) | |
|    Plaintiff, ) | FIRST AMENDED COMPLAINT FOR |
| ) | DECLARATORY AND INJUNCTIVE |
| v. ) | RELIEF |
| ) | |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY; REGINA ) | |
| MCCARTHY, in her official capacity as ) | |
| Administrator of the United States ) | |
| Environmental Protection Agency; ) | |
| NATIONAL MARINE FISHERIES ) | |
| SERVICE; and EILEEN SOBECK, in her ) | |
| official capacity as Assistant Administrator ) | |
| for Fisheries for the National Marine ) | |
| Fisheries Service, ) | |
| ) | |
|    Defendants, ) | |
| _____ ) | |

FIRST AMENDED COMPLAINT- 1

# I.     INTRODUCTION.

1.      Commercial salmon farms pose myriad risks to wild salmonids, many of which are well-studied and documented.  Despite known risks and harms, the National Marine Fisheries Service ("NMFS") and the United States Environmental Protection Agency ("EPA") determined in 2008 that commercial salmon farms in Puget Sound are not likely to have any adverse effect on threatened wild salmonids.  The agencies thus declined to fully evaluate and minimize the harmful effects from these operations though a formal consultation under the Endangered Species Act ("ESA").  This Court found that the 2008 determination did not meet ESA standards and ordered NMFS and EPA to reconsider their findings.  Remarkably, the agencies concluded again in 2011 that the Puget Sound commercial salmon farms are not likely to have any adverse effect on threatened salmonids and that formal consultation under the ESA is unnecessary.

2.      The next year there was an outbreak of the infectious hematopoietic necrosis virus ("IHNV") at commercial salmon farms near Rich Passage at the southern end of Bainbridge Island in Puget Sound.  Such outbreaks artificially amplify the number of viral particles that would otherwise occur due to the number and density of fish contained at the farms.  The outbreak occurred at a time when wild juvenile salmonids were migrating through the nearshore environment near the commercial salmon farms and therefore likely had significant adverse effects on the wild fish.  Nonetheless, NMFS and EPA have not revisited their 2011 determination to consider whether the Puget Sound commercial salmon farms may adversely affect threatened salmonids such that formal consultation under the ESA is required.

3.      Plaintiff Wild Fish Conservancy now challenges NMFS' 2011 determination that Puget Sound commercial salmon farms are not likely to have any adverse effect on threatened

FIRST AMENDED COMPLAINT- 2

salmonids and NMFS' and EPA's failure to reconsider that determination in light of the 2012 IHNV outbreak.  Formal consultation under the ESA is necessary to fully evaluate the risks and harm from these facilities and to minimize and monitor adverse effects.  Wild Fish Conservancy seeks a declaratory judgment, injunctive relief, and an award of litigation expenses.

## II.      JURISDICTION AND VENUE.

4.      This Court has jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, section 11(g) of the ESA, 16 U.S.C. § 1540(g), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1346(a)(2).  The requested relief is also proper under 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief).

5.      Defendants' sovereign immunity is waived under the APA, 5 U.S.C. § 702, and the ESA, 16 U.S.C. § 1540(g)(1)(A).

6.      As required by the ESA citizen suit provision, 16 U.S.C. § 1540(g)(2)(A)(i), Wild Fish Conservancy provided sixty days' notice of its intent to bring claims under that provision by a letter dated and postmarked August 25, 2015, a copy of which is attached hereto as **Exhibit 1**.

7.      The Western District of Washington is the proper venue under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because the alleged violations, and/or substantial parts of the events and omissions giving rise to the claims, occurred and are occurring within this District.  Specifically, NMFS' challenged decision was issued from the agency's office located in Seattle, Washington (King County), and the commercial salmon farms subject to that decision are located within this District.

FIRST AMENDED COMPLAINT- 3

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

### III.    PARTIES.

8.    Plaintiff Wild Fish Conservancy is a membership-based 501(c)(3) nonprofit organization incorporated in the State of Washington with its principal place of business in Duvall, Washington.  Wild Fish Conservancy is dedicated to the preservation and recovery of the Northwest's native fish species and the ecosystems upon which those species depend.  Wild Fish Conservancy brings this action on behalf of itself and its approximately 2,400 members.  Wild Fish Conservancy changed its name from "Washington Trout" in 2007.  As an environmental watchdog, Wild Fish Conservancy actively informs the public on matters affecting water quality, fish, and fish habitat in the State of Washington through publications, commentary to the press, and sponsorship of educational programs.  Wild Fish Conservancy also conducts field research on wild fish populations and has designed and implemented habitat restoration projects.  Wild Fish Conservancy has lobbied, advocated, and publicly commented on federal and state actions that affect the region's native fish and ecosystems.  Wild Fish Conservancy routinely seeks to compel government agencies to follow the laws designed to protect native fish species, particularly threatened and endangered species.

9.    Wild Fish Conservancy has representational standing to bring this action.  Wild Fish Conservancy's members use and enjoy rivers, streams, bays, passages, and other bodies of water throughout the Puget Sound basin for recreational, scientific, aesthetic, and commercial purposes.  The members intend to continue to visit these areas on a regular basis, including in the coming months and beyond.  These members observe, study, photograph, and appreciate wildlife and wildlife habitat in and around these waters.  These members also boat, fish, hike, camp, and swim in and around these waters.

FIRST AMENDED COMPLAINT- 4

10.     Wild Fish Conservancy's members derive recreational, scientific, aesthetic, and commercial benefits from the existence of healthy aquatic and marine systems and wild salmonids and other fish through water recreation, wildlife observation and study, photography, and fishing.

11.     The past, present, and future enjoyment of Wild Fish Conservancy's interests and those of its members, including the recreational, aesthetic, spiritual, commercial, and scientific interests of Wild Fish Conservancy and its members, have been, are being, and will continue to be harmed by EPA's and NMFS' violations of the law, by the agencies' actions and inactions challenged herein, and by the members' reasonable concerns related to such violations, actions, and inactions.  The agencies' failure to formally consult under the ESA on the effects of Puget Sound commercial salmon farms has allowed these facilities to operate without adequate evaluation, restrictions, and monitoring in a manner that harms and threatens Wild Fish Conservancy's and its members' interests.  The members further suffer reduced enjoyment from their interests due to their reasonable concerns related to the violations alleged herein.  These injuries are fairly traceable to the actions and inactions complained of and are redressable by this Court.

12.     Wild Fish Conservancy has organizational standing to bring this action.  Wild Fish Conservancy has been actively engaged in a variety of scientific, educational, and advocacy efforts to improve wild fish populations and the habitat upon which they depend throughout the Puget Sound basin.  Wild Fish Conservancy often reviews documents produced through formal consultations under the ESA to further its understanding of activities affecting threatened and endangered species.  EPA's and NMFS' failure to formally consult on the effects to wild salmonids from commercial salmon farming in Puget Sound has deprived Wild Fish

FIRST AMENDED COMPLAINT- 5

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

Conservancy of information and analyses required by statute that could further its efforts to protect fish populations and their habitat.  This injury is fairly traceable to the actions and inactions complained of and is redressable by this Court.

13.     Defendant EPA is a federal agency within the executive branch.

14.     Defendant Regina McCarthy is the Administrator of the EPA and is being sued in that official capacity.  Administrator McCarthy is responsible for ensuring that the EPA complies with applicable laws, including the ESA.  "EPA," as used herein, refers collectively to EPA and its Administrator.

15.     Defendant NMFS, also known as NOAA Fisheries, is a federal agency within the executive branch and is a sub-agency within the National Oceanic and Atmospheric Administration, which is an agency within the United States Department of Commerce.

16.     Defendant Eileen Sobeck is the Assistant Administrator for Fisheries of NMFS and is being sued in that official capacity.  Assistant Administrator Sobeck is responsible for ensuring that NMFS complies with applicable laws, including the ESA.  "NMFS," as used herein, refers collectively to NMFS and its Assistant Administrator for Fisheries.

## IV.     LEGAL BACKGROUND.

**A.     The Endangered Species Act.**

17.     The ESA is a federal statute enacted to conserve threatened and endangered species and to protect the ecosystems upon which those species depend.  16 U.S.C. § 1531(b).  "Conserve," as it is used in the ESA, means to use all methods and procedures necessary to bring threatened and endangered species to a point where the protections afforded by the statute are no longer necessary.  16 U.S.C. § 1532(3).

FIRST AMENDED COMPLAINT- 6

18.     The ESA assigns certain implementation responsibilities to the Secretary of the

United States Department of Commerce, who has delegated these duties to the Assistant

Administrator for Fisheries for NMFS.

19.     Section 4 of the ESA requires NMFS to determine whether species are threatened

or endangered and to list species as such under the statute.  16 U.S.C. §§ 1533(a)(1) and (c)(1).

Such a listing triggers various protective measures intended to conserve the species, including

the designation of critical habitat and the preparation of a recovery plan.  16 U.S.C. §§

1533(a)(3) and (f).

20.     Section 9 of the ESA makes it unlawful for any person to "take" species listed

under the statute as endangered.  16 U.S.C. § 1538(a)(1).  The take prohibition has been applied

to certain species listed as threatened under the statute though regulations promulgated by NMFS

under section 4(d) of the ESA, 16 U.S.C. § 1533(d).  *See* 50 C.F.R. §§ 223.102(c)(25) and

223.203(a).  Section 9 of the ESA prohibits a violation of those regulations.  16 U.S.C. §

1538(a)(1)(G).

21.     "Take" is defined broadly under the ESA to include harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.  16

U.S.C. § 1532(19).

22.     NMFS defines "harass" to include an intentional or negligent action that has the

potential to injure an animal or disrupt its normal behaviors to a point where such behaviors are

abandoned or significantly altered.

23.     Harm is defined to include significant habitat modification or degradation where

it actually kills or injures wildlife by significantly impairing essential behavioral patterns,

including breeding, feeding or sheltering.  50 C.F.R. § 17.3; 50 C.F.R § 222.102.

FIRST AMENDED COMPLAINT- 7

24.     Section 7 of the ESA imposes a substantive obligation on federal agencies to "*insure* that any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species.  *See* 16 U.S.C. § 1536(a)(2) (emphasis added); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

25.     Such jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.  50 C.F.R. § 402.02.

26.     Destruction or adverse modification of critical habitat occurs where there is a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.  50 C.F.R. § 402.02.

27.     In fulfilling the substantive mandates of section 7 of the ESA, federal agencies planning to authorize, fund, or carry out an action (the "action agency") that "may affect" ESA-listed species or their critical habitat are required to consult with NMFS (the "consulting agency") regarding the effects of the proposed action.  50 C.F.R. § 402.14(a).

28.     If an action agency determines through an informal consultation with NMFS that the proposed action is not likely to adversely affect ESA listed species or critical habitat and NMFS issues a written concurrence in that determination, the consultation requirements of section 7 of the ESA are fulfilled and formal consultation is not required.  50 C.F.R. § 402.13(a).

29.     An action is "likely to adversely affect" protected species or critical habitat, and formal consultation is required under section 7 of the ESA, if "*any* adverse effect to listed

FIRST AMENDED COMPLAINT- 8

species *may* occur as a direct or indirect result of the proposed action or its interrelated or interdependent actions, and the effect is not discountable, insignificant, or beneficial." *Endangered Species Consultation Handbook*, March 1998, p. xv (emphasis added).  Effects are insignificant only if they cannot be meaningfully measured, detected, or evaluated, and should never reach the scale where a take of a protected species occurs. *Id.* at xv-xvi.  Discountable effects are those that are "extremely unlikely" and not expected to occur. *Id.*

30.    Formal consultation under section 7 of the ESA concludes with NMFS' issuance of a biological opinion determining whether the action is likely to jeopardize ESA-protected species or result in adverse modification of critical habitat. 50 C.F.R. § 402.14(h)(3).

31.    If NMFS concludes that jeopardy is not likely, an incidental take statement is issued with the biological opinion specifying conditions under which take of listed species incidental to the proposed action may occur.  16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).  The incidental take statement includes reasonable and prudent measures considered by NMFS as necessary or appropriate to minimize impacts on ESA listed species and monitoring and reporting requirements to monitor impacts.  16 U.S.C. § 1536(b)(4)(C)(ii), (iv); 50 C.F.R §§ 402.14(i)(1)(ii), (iv), and 402.14(i)(3).  The incidental take statement functions as a permit exempting from liability any take resulting from the action to the extent that those covered thereby fully comply with the terms and conditions of the incidental take statement. *See* 16 U.S.C. § 1536(o)(2); *and* 50 C.F.R. § 402.14(i)(5); *and Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001).

FIRST AMENDED COMPLAINT- 9

32.     Federal agencies are required to use the "best scientific and commercial data available" in fulfilling the consultation requirements of section 7 of the ESA.  16 U.S.C. § 1536(a)(2).

33.     After consultation, Federal agencies have a continuing duty under section 7 of the ESA to insure that their actions will not jeopardize the continued existence of listed species or adversely modify designated critical habitat.  Agencies must re-initiate consultation where discretionary Federal involvement or control over the action has been retained or is authorized by law and: the amount or extent of take specified in an incidental take statement is exceeded; new information reveals effects to listed species or critical habitat in a manner or to an extent not previously considered; the action is modified in a manner that causes an effect to listed species or critical habitat that was not considered; or where a new species is listed or critical habitat designated that may be affected by the action.  50 C.F.R. § 402.16.  "The duty to reinitiate consultation lies with both the action agency and the consulting agency."  *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).

**B.     The Clean Water Act.**

34.     The objective of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq.*, is to restore and maintain the chemical, physical, and biological integrity of the nation's waters.  33 U.S.C. § 1251(a).  To achieve this objective, the CWA declares, among other things, that it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985, and that it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983.  *Id.*

FIRST AMENDED COMPLAINT- 10

35.     Central to achievement of the objectives of the CWA are the establishment and attainment of water quality standards.  33 U.S.C. § 1313.  "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses."  40 C.F.R. § 131.2.  "Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses.  Water quality standards are to protect the public health or welfare, enhance the quality of water and serve the purposes of the [CWA]."  40 C.F.R. § 131.3(i).  Such standards serve the dual purposes of establishing the water quality goals for a specific body of water and serve as the regulatory basis for the establishment of water-quality based treatment controls.  40 C.F.R. § 131.2.

36.     "Designated uses" are those uses specified in water quality standards for each water body segment whether or not they are being attained.  40 C.F.R. § 131.3(f).  "Criteria" are elements of state water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use.  When criteria are met, water quality will generally protect the designated use.  40 C.F.R. § 131.3(b).

37.     The protection and attainment of water quality standards are key requirements for the issuance of permits under the National Pollutant Discharge Elimination System ("NPDES"), established to regulate point source discharges of pollutants and required for each such discharge.  33 U.S.C. §§ 1311(a) and (b)(1)(C), 1312, 1342(a)(1) and (b)(1)(A); 40 C.F.R. §§ 122.4(d) and 122.44(d).  In addition, the protection and attainment of water quality standards are important requirements and prerequisites for many other activities and programs established by

FIRST AMENDED COMPLAINT- 11

the CWA.  *See e.g.*, 33 U.S.C. § 1313(d) (program to identify waters not attaining standards and

requirement to develop plans to achieve attainment).

38.     The CWA requires states to periodically review and revise water quality

standards applicable to waters within their boundaries.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.20.

If a state revises or adopts a new water quality standard, the revised or new standard must be

submitted to EPA for review.  33 U.S.C. § 1313(c)(2); 40 C.F.R. § 131.20.

39.     Once the state submits the revised or new standard to EPA, EPA must either

approve or disapprove the standard.  33 U.S.C. § 1313(c)(3).  In the case of disapproval, EPA

must notify the state of specific changes to the revised or new standard needed to assure

compliance with the requirements of the CWA.  33 U.S.C. § 1313(c)(3); 40 C.F.R. §

131.21(a)(2).  In such case, if the state does not adopt the changes specified by EPA within

ninety days, EPA must promptly propose a revised or new standard that satisfies the statutory

requirements and then promulgate it, within ninety days of its proposal as a regulation, as a water

quality standard for the state.  33 U.S.C. § 1313(c)(3) and (4); 40 C.F.R. § 131.22.

40.     States may include in their water quality standards policies generally affecting the

application of the standards, such as mixing zones, low flows, and variances.  40 C.F.R. §

131.13.  Such policies are subject to the EPA review process described above.  *Id*.

41.     EPA retains discretionary involvement and/or control over state water quality

standards it has approved.  Notably, EPA must prepare and promulgate revised or new water

quality standards when necessary to meet the requirements of the CWA.  33 U.S.C. § 1313(c)(4).

FIRST AMENDED COMPLAINT- 12

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

# V.    FACTUAL BACKGROUND.

## A.    Puget Sound's Threated Salmonids.

42.    The Puget Sound Chinook salmon evolutionary significant unit ("ESU") was listed as a threatened species in 1999.  64 Fed. Reg. 14,308 (March 24, 1999); 70 Fed. Reg. 37,160 (June 28, 2005); 50 C.F.R. §§ 223.102(c)(8) and 223.203(a).  Critical habitat has been designated for this species.  70 Fed. Reg. 52,630 (Sept. 2, 2005).

43.    Chinook salmon in Puget Sound are predominately "ocean-type," meaning they migrate to saltwater during their first year after spending little or no time in freshwater.  These fish make extensive use of the estuary and nearshore environments.  The nearshore habitat is therefore particularly important to Puget Sound Chinook salmon and has been designated as critical habitat for the species throughout Puget Sound.  50 C.F.R. § 226.212(i)(16); 70 Fed. Reg. 52630, 52637-38 (Sept. 2, 2005).

44.    The Hood Canal summer-run chum salmon ESU is listed as a threatened species. 64 Fed. Reg. 14508 (March 25, 1999).  NMFS has designated critical habitat for this species.  70 Fed. Reg. 52,630 (Sept. 2, 2005); 50 C.F.R. § 226.212(m)(5).

45.    Summer chum do not rear in freshwater, but rather migrate to natal estuaries almost immediately upon emergence.  Some summer chum may rear in natal estuaries for a period, while others move directly into shoreline habitats.  The continued survival of this species depends substantially on estuarine conditions.  NMFS has therefore designated the nearshore environment throughout Puget Sound as critical habitat for this species as well.  50 C.F.R. § 226.212(m)(5); 70 Fed. Reg. 52630, 52637-38 (Sept. 2, 2005).

FIRST AMENDED COMPLAINT- 13

46.     The Puget Sound distinct population segment ("DPS") of steelhead was listed as a threatened species in 2007.  72 Fed. Reg. 26,722 (May 11, 2007).  NMFS has not yet designated critical habitat for this species.

**B.     Commercial Salmon Farms and Their Effects on Wild Salmonids.**

47.     Commercial salmon farms house fish in net pens, which are floating facilities that contain young and mature salmon in permeable enclosures, such as netting, in open water.  The fish are hatched at freshwater hatcheries and the smolts are transferred to the marine net pens where they are cultivated to a marketable size.  Due to characteristics conducive to commercial success, Atlantic salmon are the primary species raised.

48.     There are currently eight Atlantic salmon net pens in Puget Sound that produce over 10 million pounds of salmon annually.  Three of the facilities are located in or around Deepwater Bay of Cypress Island north of Anacortes, three are south of Bainbridge Island in Rich Passage, one is northeast of Port Angeles Harbor just south of Ediz Hook, and one is located near Hope Island in Skagit Bay.

49.     Scientific studies have documented various ecological and environmental threats presented by the operation of Atlantic salmon net pens.  These threats include: breeding, amplification, and transmission of diseases and parasites (*e.g.*, sea lice); smothering of the benthic layer in the vicinity of the net pens by the waste food, fish feces, and other pollutants discharged by the net pens; chemical pollution (a wide range of chemicals are used, including antibiotics and pesticides); habitat modification; and escapement and colonization by Atlantic salmon as exotic species.

FIRST AMENDED COMPLAINT- 14

**C.** **Washington's Revised Water Quality Standards and EPA's Approval Thereof.**

50.     Large commercial salmon farms such as those in Puget Sound are considered point sources of pollution under the CWA and therefore require NPDES permits.  *See* 40 C.F.R. § 122.24(a)–(b) and Appendix C.

51.     The State of Washington has a federally-approved NPDES program administered by the Washington Department of Ecology ("Ecology").  WASH. REV. CODE § 90.48.260; WASH. ADMIN. CODE ch. 173-220.  This program was approved by EPA under 33 U.S.C. § 1342(b).

52.     As part of its CWA water quality standards, Washington has established sediment management standards that were first approved by EPA under 33 U.S.C. § 1313(c) in 1991.  *See* WASH. ADMIN. CODE ch. 173-204.

53.     Ecology adopted revisions to state water quality standards on December 31, 1995, including the enactment of a regulation that specifically addresses the regulation of discharges from commercial salmon farms.  *See* WASH. ADMIN. CODE § 173-204-412.  That regulation exempts commercial salmon farms and associated discharges from substantial portions of Washington's sediment management standards, including limitations on sediment impact zones. *See* WASH. ADMIN. CODE § 173-204-412(2).  This regulation was intended to enable the issuance of NPDES permits to commercial salmon farms in Puget Sound that would not require the facilities to implement what was perceived as costly pollution control measures.

54.     On June 3, 1996, Ecology submitted these revised water quality standards to EPA for review as revised and/or new water quality standards.  EPA failed to act on this submission for over twelve years—well-past the time prescribed by the CWA.  *See* 33 U.S.C. § 1313(c)(3).

FIRST AMENDED COMPLAINT- 15

55.     Ecology nonetheless issued NPDES permits to all eight of the commercial salmon farms in Puget Sound.  Those NPDES permits incorporate the exemptions and other provisions of Washington's revised water quality standards.

**D.      The Prior Litigation and EPA's and NMFS' Actions in Response Thereto.**

56.     Wild Fish Conservancy sued EPA in this Court on January 30, 2008, for failing to act on Ecology's submission of the revised water quality standards applicable to commercial salmon farms within the time required under the CWA.

57.     In response to that lawsuit, EPA informed NMFS that it intended to approve the revised water quality standards and that such approval may affect but is not likely to adversely affect several species protected under the ESA.  By letter dated June 9, 2008, NMFS concurred in EPA's determination.  That completed the agencies' consultation under section 7 of the ESA, 16 U.S.C. § 1536.  *See* 50 C.F.R. §§ 402.13 and 402.14(b)(1).  EPA then approved the revised water quality standards by letter dated September 18, 2008.

58.     Wild Fish Conservancy subsequently supplemented its pleadings to challenge the ESA consultation and EPA's approval of the revised water quality standards.

59.     The Court found that NMFS and EPA failed to use the required best scientific and commercial data available in conducting their informal consultation under section 7 of the ESA. *Wild Fish Conservancy v. U.S. Envtl. Prot. Agency*, No. C08-156-JCC, 2010 U.S. Dist. LEXIS 41838, at *15-16 (April 28, 2010).  Specifically, the agencies failed to address species recovery plans prepared under the ESA using the best available science, which explicitly identify threats to the species associated with commercial salmon farms.  *Id.* at *9-13.  The Court thus set aside EPA's approval of the revised water quality standards pertaining to salmon farms and ordered

FIRST AMENDED COMPLAINT- 16

EPA and NMFS to reconsider whether formal consultation is necessary under the ESA using the best available science. *Id.* at *20.

**E.      The Agencies' Second ESA Consultation and Approval of CWA Standards.**

60.      EPA submitted an updated biological evaluation to NMFS dated December 13, 2010, again concluding that approval of the revised water quality standards applicable to Puget Sound commercial salmon farms is not likely to adversely affect species protected under the ESA or their critical habitat.

61.      By letter and findings dated April 8, 2011, NMFS concurred with EPA's conclusion that the revised water quality standards are not likely to adversely affect ESA-listed species or their critical habitat, which concluded the agencies' consultation under section 7 of the ESA, 16 U.S.C. § 1536. *See* 50 C.F.R. §§ 402.13 and 402.14(b)(1). NMFS' concurrence was based, in part, on its finding that "[t]here is a low risk that the presence of salmon farms will increase the incidences of disease among wild fish."

62.      EPA's biological evaluation and NMFS' concurrence both rely on three outdated reports that suggest that Puget Sound commercial salmon farms pose low risks to Puget Sound salmonid populations as a whole. These reports do not support a finding that the facilities do not have any adverse effects on ESA-listed salmonids. Moreover, EPA and NMFS ignored and/or discounted extensive studies and reports documenting the adverse effects of commercial salmon farms on wild salmonids in reaching their conclusions.

63.      EPA re-approved the revised water quality standards, including those specific to the Puget Sound commercial salmon farms (WASH. ADMIN. CODE § 173-204-412), on April 22, 2011.

FIRST AMENDED COMPLAINT- 17

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

**F.**   **The 2012 Outbreak of IHNV at Puget Sound Commercial Salmon Farms.**

64.   There was an outbreak of IHNV in 2012 at the three commercial salmon farms located in Rich Passage south of Bainbridge Island—the Orchard Rocks, Fort Ward, and Clam Bay facilities.  IHNV is among the most virulent pathogens of salmonids.

65.   While it is likely that the infections arose from wild fish, the high densities in the net pens of Atlantic salmon, which are highly susceptible to IHNV, artificially elevated (bioamplified) the number of viral particles present.

66.   These three net pens are located within wild salmon habitat.  Juvenile salmonids—those most susceptible to IHNV—must migrate past these commercial salmon farms on their way to sea.  The outbreak occurred in April and May when juvenile Chinook salmon emigration nears its peak.

67.   Reports indicate that the outbreak was in the "U" clade of IHNV, which is pathogenic for Chinook salmon and steelhead.

68.   Wild Fish Conservancy's August 25, 2015, letter to EPA and NMFS, attached hereto as **Exhibit 1**, requested that the agencies reinitiate ESA consultation in light of this outbreak.  Submitted with the letter was a declaration from Dr. Todd Sandell, who holds a Ph.D. in Pathogenic Microbiology and has substantial knowledge and experience in the disease ecology of Pacific salmon.  Dr. Sandell explained that, "given the magnitude and duration of the IHNV outbreak [and] the proximity of the infected net pens to nearshore habitat utilized by Pacific salmon…, it is highly likely that ESA-listed Chinook salmon and steelhead trout were harmed."

FIRST AMENDED COMPLAINT- 18

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

69.     EPA and NMFS have not reinitiated consultation under section 7 of the ESA to evaluate whether the 2012 outbreak caused effects to ESA listed salmonids or their critical habitat in a manner or to an extent not previously considered.

## VI.     CAUSES OF ACTION.

**A.**     **First Cause of Action: NMFS' Concurrence is Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with Law.**

70.     Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth above.

71.     Adverse effects to ESA-listed salmonids, including threatened Puget Sound Chinook salmon, threatened Puget Sound steelhead, and threatened Hood Canal summer-run chum salmon, and to the critical habitat of threatened Puget Sound Chinook salmon and threatened Hood Canal summer-run chum salmon, may occur as a direct or indirect result of EPA's approval of the revised water quality standards for commercial salmon farms—codified at WASH. ADMIN. CODE § 173-204-412—or as a result of interrelated or interdependent actions. Formal consultation on EPA's action is therefore required under section 7 of the ESA.

72.     NMFS failed to use the best scientific and commercial data available during its informal consultation with EPA that concluded with NMFS' April 8, 2011, concurrence letter.

73.     NMFS' April 8, 2011, concurrence in EPA's not likely to adversely affect determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law and is reviewable under the APA, 5 U.S.C. §§ 701–706.

**B.**     **Second Cause of Action: EPA's Failure to Reinitiate ESA Consultation.**

74.     Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth above.

FIRST AMENDED COMPLAINT- 19

75.     The 2012 outbreak of IHNV at three commercial salmon farms in Puget Sound and documents associated therewith have revealed effects from EPA's approval of the revised water quality standards that may affect listed species and/or critical habitat in a manner or to an extent not previously considered.  Reinitiation of the consultation that concluded with NMFS' April 8, 2011, concurrence letter is therefore required under the ESA.

76.     EPA is in violation of the ESA for failing to reinitiate consultation with NMFS on the effects of approving the revised water quality standards for commercial salmon farms.  This violation is reviewable under section 11(g) of the ESA, 16 U.S.C. 1540(g).

**C.     Third Cause of Action: NMFS' Failure to Reinitiate ESA Consultation.**

77.     Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth above.

78.     NMFS has unlawfully withheld or unreasonably delayed the required reinitiation of the ESA consultation that concluded with the agency's April 8, 2011, concurrence letter.  This ongoing violation is reviewable under the APA, 5 U.S.C. §§ 701–706.

**D.     Fourth Cause of Action: EPA's Failure to Insure No Jeopardy.**

79.     Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth above.

80.     EPA has failed to insure that its approval of the revised water quality standards is not likely to jeopardize the continued existence of threatened Puget Sound Chinook salmon, threatened Puget Sound steelhead, and threatened Hood Canal summer-run chum salmon, and/or result in the destruction or adverse modification of critical habitat for threatened Puget Sound Chinook salmon and threatened Hood Canal summer-run chum salmon.  For example, EPA's approval relied on the deficient ESA consultation that concluded with NMFS' April 8, 2011,

FIRST AMENDED COMPLAINT- 20

concurrence letter.  Further, EPA has failed to reinitiate ESA consultation to consider new information revealed in connection with the 2012 IHNV outbreak.

81.     EPA's failure to insure no jeopardy and/or adverse modification is a violation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).  This violation is reviewable under section 11(g) of the ESA, 16 U.S.C. 1540(g).

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff Wild Fish Conservancy respectfully requests that the Court grant the following relief:

A.     Issue a declaratory judgment declaring that NMFS' April 8, 2011, concurrence in EPA's not likely to adversely affect determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

B.     Issue a declaratory judgment declaring that EPA is in violation of the ESA for failing to reinitiate consultation with NMFS on the effects of approving the revised water quality standards for commercial salmon farms.

C.     Issue a declaratory judgment declaring that NMFS has unlawfully withheld or unreasonably delayed reinitiating ESA consultation on EPA's approval of the revised water quality standards.

D.     Issue a declaratory judgment declaring that EPA has failed to insure that its approval of the revised water quality standards is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat for such species.

FIRST AMENDED COMPLAINT- 21

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

E.      Vacate and set aside EPA's approval of the revised water quality standards for commercial salmon farms—WASH. ADMIN. CODE § 173-204-412—under the APA and/or the ESA until full compliance with the ESA is achieved.

F.      Issue a mandatory injunction requiring NMFS and EPA to fully comply with the ESA, including a requirement that the agencies reinitiate ESA consultation on EPA's proposed approval of the revised water quality standards and that NMFS prepare a biological opinion therefor.

G.      Grant such other preliminary and permanent relief as Wild Fish Conservancy may request during the pendency and resolution of this litigation.

H.      Award Wild Fish Conservancy its litigation expenses, including attorney fees, expert witness fees, Court costs, and other expenses as necessary for the preparation and litigation of this case under section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or as otherwise authorized by law; and

I.      Grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 9th day of February, 2016.


KAMPMEIER & KNUTSEN, PLLC


By: s/ Brian A. Knutsen
    Brian A. Knutsen, WSBA No. 38806
833 S.E. Main Street, No. 318
Portland, Oregon 97214
Tel: (503) 841-6515
Email: brian@kampmeierknutsen.com

*Attorneys for Plaintiff Wild Fish Conservancy*

FIRST AMENDED COMPLAINT- 22

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2016, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System which will send notification of such filing to the

attorneys of record.

s/ Brian A. Knutsen
Brian A. Knutsen, WSBA No. 38806
Attorney for Plaintiff
Kampmeier & Knutsen, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
Tel: (503) 841-6515
Email: brian@kampmeierknutsen.com

FIRST AMENDED COMPLAINT- 23

KAMPMEIER & KNUTSEN, PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
(503) 841-6515

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

BRIAN A. KNUTSEN
Licensed in Oregon & Washington
503.841.6515
brian@kampmeierknutsen.com

August 25, 2015

**Certified U.S. Mail – Return Receipt Requested**

Office of the Administrator
United States Environmental Protection Agency
William Jefferson Clinton Building
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Administrator Regina A. McCarthy
United States Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

National Marine Fisheries Service (NOAA Fisheries)
1315 East West Highway
Silver Spring, MD 20910

Assistant Administrator for Fisheries Eileen Sobeck
National Marine Fisheries Service (NOAA Fisheries)
1315 East West Highway
Silver Spring, MD 20910

Secretary Penny Pritzker
United States Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

**RE:**   **Notice of Intent to Sue U.S. Environmental Protection Agency and National Marine
Fisheries Service for Violations of the Endangered Species Act Associated with
Consultation on Washington State's Revised Sediment Management Standards for
Marine Finfish Facilities**

Dear Honorable Civil Servants:

This letter provides notice of Wild Fish Conservancy's intent to sue the United States Environmental Protection Agency, Regina McCarthy in her official capacity as the Administrator of the United States Environmental Protection Agency (collectively, "EPA"), the National Marine Fisheries Service, and Eileen Sobeck in her official capacity as the Assistant Administrator for Fisheries of the National Marine Fisheries Service (collectively, "NMFS") for violations of the Endangered Species Act ("ESA") associated with EPA's approval of revisions to Washington Sediment Management Standards for Marine Finfish Facilities and the ESA section 7 consultation therefor.  This letter is provided pursuant to section 11(g) of the ESA, 16 U.S.C. § 1540(g).  Also provided herewith is a declaration by Todd Sandell, Ph.D., which Wild Fish Conservancy requests EPA and NMFS consider in determining whether to reinitiate the ESA consultation described herein.

EPA initiated informal consultation with NMFS under section 7 of the ESA in 2008 on the effects of EPA's proposed approval of revisions to Washington sediment management standards intended to enable commercial salmon farms in Puget Sound to be permitted under the Clean Water Act ("CWA").[1]  Despite the known harm and significant risks these facilities pose to wild salmonids, NMFS issued a determination that EPA's action is not likely to adversely affect protected species on June 9, 2008.[2]  The ESA consultation was thus concluded without fully evaluating the effects of commercial salmon farms through preparation of a biological opinion and without imposing monitoring and other requirements through an incidental take statement designed to protect wild salmonids.

Wild Fish Conservancy challenged the 2008 consultation as insufficient under the ESA.  Judge Coughenour of the Western District of Washington found the 2008 consultation inadequate and set aside EPA's approval of the revised Sediment Management Standards.  *Wild Fish Conservancy v.U.S. Envtl. Prot. Agency*, No. C08-0156-JCC, 2010 U.S. Dist. LEXIS 41838 (April 28, 2010).  The Court further ordered EPA and NMFS to reconsider whether formal consultation is required.

EPA reinitiated ESA consultation with NMFS on the Sediment Management Standards in 2010.  Remarkably, NMFS again issued a determination that the Puget Sound commercial salmon farms are not likely to adversely affect threatened and endangered species on April 8, 2011.[3]  Consultation was thus again concluded without any detailed analysis of these facilities and without the imposition of monitoring or other requirements.

There was an outbreak of the infectious hematopoietic necrosis virus ("IHNV") in May of 2012, at net pen complexes near Rich Passage at the southern end of Bainbridge Island.  This

---

[1] The revisions to the Washington sediment management standards at issue include Wash. Admin. Code 173-204-412, which addresses regulation of discharges from net pens and exempts such operations from sediment management standards within an impact zone of 100 feet in all directions from the net pens.

[2] NMFS Tracking No. 2008/02328.

[3] NMFS Tracking No. 2010/06071.

occurred at a time when juvenile salmonids were migrating through the nearshore environment near the commercial salmon facilities.  A document prepared by the Washington Department of Fish and Wildlife found that "certainly there is amplification occurring."  It can hardly be disputed that this disease outbreak adversely affected threatened salmonids—or, at a minimum, demonstrates that commercial salmon farms in Puget Sound *may* adversely affect ESA-listed species.  EPA and NMFS are in violation of the ESA for failing to reinitiate consultation to fully evaluate the adverse effects of the commercial salmon farms in Puget Sound and have also failed to insure that these facilities do not jeopardize protected species.

## I.    **Legal Framework.**

Section 7 of the ESA imposes a substantive obligation on federal agencies to "*insure* that any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species.  *See* 16 U.S.C. § 1536(a)(2) (emphasis added); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).  Such jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.  50 C.F.R. § 402.02.  Destruction or adverse modification of critical habitat occurs where there is a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.  *Id.*

In fulfilling the substantive mandates of section 7 of the ESA, federal agencies planning to fund, authorize, or undertake an action (the "action agency") that "may affect" ESA-listed species or their critical habitat are required to consult with NMFS (the "consulting agency") regarding the effects of the proposed action.  50 C.F.R. § 402.14(a).  Formal consultation concludes with NMFS' issuance of a biological opinion determining whether the action is likely to jeopardize ESA-protected species or result in adverse modification of critical habitat.  50 C.F.R. § 402.14(h)(3).  If NMFS determines that such jeopardy is not likely, or that reasonable and prudent alternatives to the proposed action will avoid jeopardy, and that any taking of listed species incidental to the proposed action will not violate section 7(a)(2) of the ESA, NMFS must issue an incidental take statement with its biological opinion.  16 U.S.C. § 1536(b)(4).  The incidental take statement includes reasonable and prudent measures considered by NMFS as necessary or appropriate to minimize impacts on ESA listed species.  16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R § 402.14(i)(1)(ii).

Informal consultation is an optional process that includes all discussions between NMFS and the action agency prior to formal consultation, if required.  50 C.F.R. § 402.02.  If, through this process, the action agency determines that its proposed action is "not likely to adversely affect" protected species and NMFS issues a written concurrence in that determination, the consultation requirements of section 7 of the ESA are fulfilled and formal consultation is not required.  50 C.F.R. § 402.13(a).

Federal agencies have a continuing duty under section 7 of the ESA after consultation is concluded to insure that their actions will not jeopardize the continued existence of listed species

or adversely modify designated critical habitat.  The agencies must reinitiate consultation whenever "the amount or extent of taking specified in the incidental take statement is exceeded," "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," where the action in question is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," or where "a new species is listed or critical habitat designated that may be affected by the identified action."  50 C.F.R. § 402.16(a)-(d).  "The duty to reinitiate consultation lies with both the action agency and the consulting agency."  *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).

## II.   Factual Background.

### A.   Affected Species and Critical Habitat.

NMFS listed the Puget Sound Chinook salmon evolutionary significant unit ("ESU") as a threatened species in 1999.  64 Fed. Reg. 14,308 (March 24, 1999); 70 Fed. Reg. 37,160 (June 28, 2005); 50 C.F.R. §§ 223.102(c)(8) and 223.203(a).  Critical habitat has been designated for this species.  70 Fed. Reg. 52,630 (Sept. 2, 2005).

The Puget Sound distinct population segment ("DPS") of steelhead was listed as a threatened species in 2007.  72 Fed. Reg. 26,722 (May 11, 2007).

The Hood Canal summer-run chum salmon ESU is listed as a threatened species.  64 Fed. Reg. 14508 (March 25, 1999).  NMFS has designated critical habitat for this species.  70 Fed. Reg. 52,630 (Sept. 2, 2005); 50 C.F.R. § 226.212(m)(5).

Chinook salmon in Puget Sound are predominately "ocean-type," meaning they migrate to saltwater during their first year after spending little or no time in freshwater.  These fish make extensive use of the estuary and nearshore environments, which they enter when they are extremely small (less than 50 mm in length).  The nearshore habitat—defined to extend outward from shore (including islands) to a water depth of approximately 30 meters (98.4 feet)—is therefore particularly important to Puget Sound Chinook salmon and has been designated as critical habitat for this species throughout Puget Sound.  50 C.F.R. § 226.212(i)(16); 70 Fed. Reg. 52630, 52637-38 (Sept. 2, 2005) (the significance of the nearshore environment to juvenile salmonids was the primary basis for its designation as critical habitat).

When NMFS listed Puget Sound Chinook salmon under the ESA, it found:

> Overall abundance of Chinook salmon in the Puget Sound ESU has declined substantially from historical levels, and many populations are small enough that genetic and demographic risks are likely to be relatively high.

Several populations within this ESU have already become extinct, and several others—including those within the Nooksack, Lake Washington, mid-Hood Canal, Puyallup, and Dungeness basins—have experienced critically low returns of less than 200 adult fish in recent years.

4

Summer chum do not rear in freshwater, but rather migrate to natal estuaries almost immediately upon emergence.  These fish are the same size when they enter estuaries as emerging fry—less than 40 millimeters.  Some summer chum may rear in natal estuaries for a period, while others move directly into shoreline habitats.  The "continued survival [of this species] depends substantially on estuarine conditions."  NMFS has therefore designated the nearshore environment throughout Puget Sound as critical habitat for this species as well.  50 C.F.R. § 226.212(m)(5); 70 Fed. Reg. 52630, 52637-38 (Sept. 2, 2005) (the significance of the nearshore environment to juvenile salmonids was the primary basis for its designation as critical habitat).  Hood Canal summer-run chum experienced a severe drop in abundance in the 1980's, and returns decreased to all time lows in 1989 and 1990 with less than a thousand spawners each year.

Puget Sound wild steelhead numbers are approximately 1 to 4% of their historical abundance.  NMFS' 2011 "status review" of this species stated that "[m]ost populations within the [Puget Sound steelhead] DPS are showing continued downward trends in estimated abundance, a few sharply so."  The estimated mean population growth rates for all but a few populations within the Puget Sound steelhead DPS are declining—typically by -3 to -10% annually.  The Puget Sound Steelhead Technical Recovery Team recently assessed the extirpation risk of twenty of the twenty-three component populations of the Puget Sound steelhead DPS.  Twelve of the twenty were rated as a "high" extirpation risk ($\geq$ 70% probability in the next 20-100 years) and one additional one was rated as a "moderately high" extirpation risk (50% probability in the next 100 years).  Only seven of the twenty populations, or 35%, were rated as a "low" risk of extirpation.

**B.      Commercial Salmon Farms in Puget Sound.**

There are currently eight Atlantic salmon net pens operated in Puget Sound that produce over 10 million pounds of salmon annually.  Four of the facilities are located in or around Deepwater Bay of Cypress Island north of Anacortes, three are south of Bainbridge Island in Rich Passage, and one is northeast of Port Angeles Harbor just south of Ediz Hook.  Fish are hatched at freshwater hatcheries and the smolts are transferred to the marine net pens in Puget Sound where they are cultivated to a marketable size.

Net pens are floating facilities that contain salmon in permeable enclosures in open marine water.  Due to characteristics conducive to commercial success, non-native Atlantic salmon species are raised.  The salmon are given feed, antibiotics, and other medications and treatments as necessary.

Atlantic salmon farms have negative environmental and ecological effects.  Environmental concerns include biological pollution (escaped famed fish can compete with and prey on native salmonids and farmed fish can transmit disease and parasites to wild fish), organic pollution and eutrophication (fish feces, uneaten fish food, and dead fish contribute to nutrient loading which can lead to low- or no-oxygen "dead-zones"), chemical pollution (a wide range of chemicals are used, including antibiotics and pesticides), and habitat modification.

C.       **EPA's Approval of Revised Sediment Management Standards and the Associated ESA Consultation.**

Washington has adopted sediment management standards as part of its water quality standards required under the CWA, which EPA approved in 1991 under section 303(c) of the Clean Water Act ("CWA"). The Washington State Legislature enacted legislation in 1993 that directed the Washington Department of Ecology ("Ecology") to adopt standards and criteria specifically for salmon net pens. Rev. Code Wash. 90.48.220. The legislation was specifically intended to require revisions to state water quality standards so that salmon net pens could receive permits that would allow these facilities to operate within the mandates of the CWA.

Ecology responded in 1995 with the promulgation of WAC 173-204-412, which specifically addresses regulation of marine finfish rearing facilities under Washington's CWA permitting program. "Marine finfish rearing facilities," commonly referred to as "net pens," are defined as "facilities located within state waters where finfish are fed, nurtured, held, maintained, or reared to reach the size of release or for market sale." WAC 173-204-200(13). This regulation includes various revisions to Washington's sediment management standards, one of which exempts net pens from the sediment management standards within an impact zone of 100 feet in all directions from the net pen facilities. WAC 173-204-412(2).

WAC 173-204-412 was submitted to EPA in 1996 as part of a package of revised water quality standards, but EPA failed to act on the submission for twelve years—until Wild Fish Conservancy provided notice of its intent to commence a CWA citizen suit for EPA's failure to act on the proposed standards within 90 days of Ecology's submission as required under section 303(c) of the CWA.

EPA subsequently notified NMFS of its intent to approve the revisions to WAC 173-204 and requested that NMFS concur in the determination that this action was "not likely to adversely affect" threatened and endangered species. EPA supported its request with a Biological Evaluation. EPA informed NMFS on multiple occasions that it wished to move quickly through the ESA consultation process because EPA was being sued for its failure to act on the revised water quality standards.

NMFS subsequently concurred in EPA's "not likely to adversely affect" determination on June 9, 2008, thereby concluding the ESA section 7 consultation process. EPA then approved the revised water quality standards on September 18, 2008. As noted, the Western District of Washington found this consultation inadequate and set aside EPA's approval. *Wild Fish Conservancy v. U.S. Envtl. Prot. Agency*, No. C08-0156-JCC, 2010 U.S. Dist. LEXIS 41838 (April 28, 2010). The Court further ordered EPA and NMFS to reconsider whether formal consultation is required.

EPA sent NMFS a letter dated December 13, 2010, again announcing its intent to approve the revisions to the sediment management standards and requesting that NMFS concur in EPA's determination that the action is not likely to adversely affect ESA-listed species. EPA supported this request with an update to its previous Biological Evaluation. NMFS issued a letter dated April 8, 2011, concurring in the not likely to adversely affect determination, thereby

concluding the ESA consultation.  EPA then approved the revisions to sediment management standards on April 22, 2011, including the exemptions for commercial salmon farms at WAC 173-204-412.

## III.   EPA and NMFS Violations of the ESA.

EPA and NMFS are in violation of the ESA for not reinitiating their ESA consultation on EPA's approval of the revised sediment management standards applicable to the Puget Sound commercial salmon farms.  Further, EPA is in violation of section 7 of the ESA for failing to insure that its approval is not likely to jeopardize ESA-listed species or adversely modify their critical habitat.

### A.   Failure to Reinitiate Consultation.

EPA and NMFS are in violation of section 7(a)(2) of the ESA, 16 U.S.C. § 136(a)(2), for failing to reinitiate consultation on the effects of EPA's approval of the revised sediment management standards to Puget Sound Chinook salmon and its critical habitat, Puget Sound steelhead, and Hood Canal summer-run chum salmon and its critical habitat.

Events and occurrences that have occurred since NMFS concluded its previous consultation on April 8, 2011, have triggered the requirement to reinitiate that consultation. Most notably, the outbreak of IHNV in May of 2012, at the net pen complexes near Rich Passage reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.  Moreover, this outbreak undermines NMFS' "not likely to affect" determination and warrants formal consultation on EPA's actions.

Submitted herewith is a declaration of Todd Sandell, Ph.D., describing the May 2012 outbreak of IHNV and its likely effects of threatened salmonids.  Wild Fish Conservancy requests that EPA and NMFS consider this declaration in determining whether to reinitiate ESA consultation.  Dr. Sandell explains that IHNV is among the most virulent pathogens of salmonids.  *Sandell Decl.*, ¶ 12.  The outbreak occurred at three commercial salmon farms located in Rich Passage south of Bainbridge Island—the Orchard Rocks, Fort Ward, and Clam Bay facilities.  While it is likely that the net pen infections arose from wild fish, the high densities in the net pens of Atlantic salmon, which are highly susceptible to IHNV, artificially elevated (bioamplified) the number of viral particles present.  *Id.*  These three net pens are located within wild salmon habitat. *Id.* at ¶ 14.  In fact, juvenile salmonids—the most susceptible to IHNV—must migrate past these commercial salmon farms on their way to sea. *Id.* The outbreak occurred in April and May when juvenile Chinook and coho salmon emigration nears its peak. *Id.* ¶ 21.  Reports indicate that the outbreak are in the "U" clade of IHNV, which is pathogenic for Chinook salmon and steelhead. *Id.* at ¶ 23.  It is Dr. Sandell's opinion that, "given the magnitude and duration of the IHNV outbreak, the proximity of the infected net pens to nearshore habitat utilized by Pacific salmon…, [that] it is highly likely that ESA-listed Chinook salmon and steelhead trout were harmed." *Id.* at ¶ 24.

**B.**      <u>**Failure to Insure No Jeopardy**</u>.

In addition to the procedural consultation requirements of section 7 of the ESA, EPA is required to insure that any action it authorizes and/or carries out is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). By approving the revised sediment management standards applicable to Puget Sound commercial salmon farms without formally consulting under section 7 of the ESA and by failing to reinitiate consultation as described herein, EPA has failed to insure that the continued existence of Puget Sound Chinook salmon, Puget Sound steelhead, and Hood Canal summer-run chum salmon is not jeopardized and that the critical habitat for Puget Sound Chinook salmon and for Hood Canal summer-run chum salmon is not destroyed or adversely modified.

**IV.**      <u>**Party Giving Notice of Intent to Sue**</u>.

The full name, address, and telephone number of the party giving notice is:

Wild Fish Conservancy
15629 Main Street N.E.
Duvall, WA 98019
Tel: (425) 788-1167

**V.**      <u>**Attorneys Representing Wild Fish Conservancy**</u>.

The attorneys representing Wild Fish Conservancy in this matter are:

Brian A. Knutsen
Kampmeier & Knutsen, PLLC
833 S.E. Main St., Mail Box 318
Portland, Oregon 97214
(503) 841-6515

Paul A. Kampmeier
Kampmeier & Knutsen, PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 x 4

**VI.**      <u>**Conclusion**</u>.

This letter provides notice under section 11(g) of the ESA, 16 U.S.C. § 1540(g), of Wild Fish Conservancy's intent to sue EPA and NMFS for violations of the ESA discussed herein. Unless these ongoing and imminent violations described herein are corrected within sixty days, Wild Fish Conservancy intends to file suit to enforce the ESA. Wild Fish Conservancy is available during the sixty-day notice period to discuss effective remedies and actions that will assure future compliance with the ESA.

Very truly yours,

KAMPMEIER & KNUTSEN, PLLC

By: _____

Brian A. Knutsen

## CERTIFICATE OF SERVICE

I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that

I am counsel for Wild Fish Conservancy and that on August 25, 2015, I caused copies of the

foregoing to be served on the following by depositing it with the U.S. Postal Service, postage

prepaid, in the manner specified:

**Via U.S. Certified Mail - Return Receipt Requested:**

Office of the Administrator
United States Environmental Protection Agency
William Jefferson Clinton Building
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Administrator Regina A. McCarthy
United States Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

National Marine Fisheries Service (NOAA Fisheries)
1315 East West Highway
Silver Spring, MD 20910

Assistant Administrator for Fisheries Eileen Sobeck
National Marine Fisheries Service (NOAA Fisheries)
1315 East West Highway
Silver Spring, MD 20910

Secretary Penny Pritzker
United States Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

Brian A. Knutsen

DECLARATION OF TODD SANDELL, M.S., Ph.D.
IN SUPPORT OF NOTICE LETTER FOR VIOLATIONS OF THE ENDANGERED
SPECIES ACT RELATING TO ESA CONSULTATION ON
PUGET SOUND COMMERCIAL SALMON FARMS

I, Todd Sandell, declare the following on the basis of personal knowledge to which I am competent to testify:

1.      My current address is 4021 NE 196th St., Lake Forest Park, WA, 98155.

**PROFESSIONAL QUALIFICATIONS**

2.      I am a senior ecologist for the Wild Fish Conservancy, which position I have held since December 2010.  I have a BS degree in Biology from Bowdoin College (Brunswick, ME).  In 2001, I received a master's degree in Microbiology from Oregon State University in Corvallis, Oregon.  I earned a Ph.D. from Oregon State University in 2010 in Pathogenic Microbiology.  I have substantial knowledge and experience in parasitology, immunology and the disease ecology of Pacific salmon (how pathogens and parasites influence and regulate populations).

3.      My undergraduate work at Bowdoin College (Brunswick, ME) included a focus on immunology.  In my senior year I completed an independent study project isolating the cymbidium mosaic virus and generated a rabbit polyclonal antibody to that virus for use in future research.  Later I worked at the Barbara Davis Clinic for juvenile (Type I) diabetes at the University of Colorado Health Sciences Center (Denver, CO) where I studied the interactions of the immune system as autoimmunity arose, leading to diabetes in humans and a mouse model.  Our work focused on the role of macrophages in triggering the autoimmune cascade and on the development of a synthetic insulin molecule that would not trigger an autoimmune response.

4.      After this I attended Oregon State University (OSU; Corvallis, OR) where
I initially studied the salmonid immune system response to the pathogen *Renibacterium
salmoninarum*; the research focused on macrophages, which harbor the bacterium, and
their potential to clear this intracellular pathogen when activated.  The lab in which I
studied also focused on the human parasite *Schistosoma mansoni*, and as a result I
learned much about comparative immunity and the unique aspects of the teleost (bony
fishes, which includes salmon) immune system.

5.      Later I moved to the Microbiology department and OSU's Salmon Disease
Laboratory, where I studied the dynamics of an exotic parasite, *Myxobolus cerebralis*
(which causes Whirling Disease in susceptible salmonids), on the salmon and trout
populations in the Lostine River, Oregon.  This work investigated the role of the
environment on parasite transmission with histology, fluorescent antibody techniques and
PCR, and identified factors increasing the density of the alternate host and on infection
and disease risk.

6.      I then spent 7 years at the Hatfield Marine Science Center investigating
how pathogens affected the growth and survival of juvenile salmon shortly after marine
entry, as well as during their emigration through the Columbia River estuary.

7.      Interest in this work led me back to graduate school at OSU, where I
studied the disease ecology of juvenile salmon in nearshore marine waters of the
northeast Pacific Ocean, utilizing polymerase chain reaction (PCR) and quantitative PCR
(qPCR), among other techniques, to detect and quantify bacterial, viral and parasitic
organisms and model their effects on growth and survival.  I defended my dissertation in

2010 and continue to publish findings from that research.  A list of relevant publications is included in with my *curriculum vitae* attached hereto.

## SUMMARY OF OPINIONS

8.      In summary, it is my opinion that the commercial salmon farms in Puget Sound likely have some adverse effects on native salmonids protected under the Endangered Species Act ("ESA").  It is further my opinion that the outbreak of the infectious hematopoietic necrosis virus ("IHNV") in May of 2012, at net pen complexes near Rich Passage at the southern end of Bainbridge Island, likely led to increased infection levels (and potential mortality) in native stocks of wild, juvenile Pacific salmon within Puget Sound, Washington with  IHNV.

## ESA-LISTED SALMONIDS IN PUGET SOUND

9**.**      The Puget Sound Chinook salmon evolutionary significant unit ("ESU") was listed as a threatened species in 1999.

10.      The Puget Sound distinct population segment ("DPS") of steelhead was listed as a threatened species in 2007.

11.      The Hood Canal summer-run chum salmon ESU is listed as a threatened species.

## THE MAY 2012 IHNV OUTBREAK

12.      IHNV is among the most virulent pathogens of salmonids, and for this reason is listed as a "reportable disease" by the World Organization for Animal Health (OIE), the international body charged with controlling the spread of animal diseases.  In 2012, a major outbreak of IHNV occurred at three Atlantic salmon net pen feedlots in Puget Sound, just minutes from downtown Seattle: Fort Ward, Clam Bay, and Orchard

Rock.  This outbreak is concerning because of the speed at which the disease spread; the close proximity of the net pens led to a rapid disease progression that exposed native salmonids to elevated levels of the IHN virus and likely caused harm to two threatened species (Puget Sound Chinook salmon and steelhead trout). While it is likely that the net pen infections arose from wild salmon, the high densities of Atlantic salmon, which are highly susceptible to IHNV, artificially elevated ("bioamplified") the number of viral particles present in South Puget Sound, increasing the infection risk for native juvenile salmon.

13.     At present the State of Washington and the federal agencies concerned do not stipulate minimum distances between the pens and do not take factors like tidal flow (affecting pathogen plumes emitted from the pens) and proximity to salmon bearing streams into consideration, despite decades of work (and catastrophic disease outbreaks costing billions of dollars in the Norwegian and Chilean Atlantic salmon farming industries) that led to the development of guidelines to reduce disease transmission. While international (OIE) guidelines suggest a minimum of 5km between pens, a study in Chile (Mardones et al. 2011) suggested that 10km between pens might be a safer guideline (note that there are no native salmon in Chile; this guideline was meant only to protect one salmon farm from infection by an adjacent farm).  In those countries, the guidelines were put in place to limit the spread of disease between farms or between farms and wild fish, and *were developed to assist the salmon farming industry in protecting their investments*.

14.     The placement of these net pens is also a concern; floating between two Washington state parks, the Orchard Rocks marine reserve (two of the net pens are

actually within part of the reserve's boundaries), and the Northwest Fisheries Science Center's Manchester Research Station (NOAA), where several endangered salmon stocks have broodstock rearing to assist in recovery efforts.  These net pens are also in the middle of wild salmon habitat (see map, below), including that of ESA listed Puget Sound Chinook salmon and steelhead stocks.  Juvenile salmonids, the life stage most susceptible to IHNV (Lapatra 1998), must emigrate past these pens and the pathogen plumes they generate on their way to sea.  A map showing the distance from the existing net pens in Puget Sound to the mouths of salmon bearing streams is below (data from WDFW: http://apps.wdfw.wa.gov/salmonscape/); the different shades of orange show proximity to salmon bearing streams at 5 and 10 km distances; the grey shading highlights urban areas. Note that there are few areas within the main basin of Puget Sound that are outside of the 5km buffer (land is shaded green);



15. Despite a declared "quarantine" of the infected pens (which does nothing to prevent the virus being shed from infected Atlantic salmon into the water flushing through the pens), the virus quickly spread to open water facilities at two other locations

in South Puget Sound, including one near the Orchard Parks Marine Reserve and one in Clam Bay.  The outbreak may also have affected nearby tribal salmon pens off Squaxin Island.  At the time, Bruce Stewart, fish health program manager for the Northwest Indian Fisheries Commission, voiced concern over the delay in removing the infected salmon: "We are concerned about the virus amplification that is occurring from the affected pens, and the length of time the amplifying event is occurring over …American Gold reported increased mortalities starting in April.  We now are at end of May and infected fish are still in those pens shedding virus."  (http://nwifc.org/2012/05/ihn-virus-detected-in-atlantic-salmon-farm-near-bainbridge-island/).

16.      A recent study of IHNV viral shedding and persistence in British Columbia (Garver et al. 2013) reported:

> "Using the laboratory estimates of IHNV shedding capacity of Atlantic salmon as derived herein, it is possible to quantify virus amplification potential from infected sites.  For instance if 1% of 500,000 Atlantic salmon contained in an open net-pen site are undergoing acute IHN disease there is a **potential for this outbreak to generate upwards of 1.6 X $10^{11}$ plaque forming units (PFU) in one hour** during peak virus shedding" (Garver et al. 2013).

That estimate is derived from one pen (500,000 fish) if only 1% (5,000) fish were acutely infected. The number of viral particles released from each infected fish is equal to (1.66 X $10^{11}$ PFU/5,000 fish) = **32,000,000 PFU released per acutely infected fish per hour**.

17.      A May 26, 2012, Associated Press article carried in the Seattle Times reported: "Seattle-based American Gold Seafoods plans to remove more than a million pounds of Atlantic salmon from infected net pens in Rich Passage.  In April, the company noticed fish were dying off at a fast rate.  Test

results this month confirmed the virus." (http://www.seattletimes.com/seattle-news/wash-fish-farm-kills-stock-after-virus-found/).]  If an average Atlantic salmon weighs 7 lbs. at harvest, one million pounds of fish culled equates to 142,857 fish.

18.     The net pens in question held infected Atlantic salmon (almost certainly more than 1% infected given the high mortality rate) for an estimated 60 days (1,440 hours). Using the conservative estimate of 142,857 fish culled by American Gold Seafoods, this would have resulted in **65,848,320,000,000** viral PFU being released from the infected Atlantic salmon into South Puget Sound during the course of the outbreak [(= 142,857 *1%= 1,429 fish acutely infected at peak shedding); ((1,429 fish) *(1,440 hours)*( 33,200,000  PFU per fish per hour)) =  **65,848,320,000,000 (** 6.58483X $10^{13}$**, or 65 *Tera*)].

19.     The volume of South Puget Sound is roughly 9% of the 168 cubic kilometer ($km^3$) total volume for all of Puget Sound (http://www.cev.washington.edu/lc/CLFISH497/Web5.html#PHYS), which equals 15.1 $km^3$ or 1.51 x$10^{10}$ cubic meters.  Applying the calculation from 1,429 infected fish to the estimated volume of 15.1 $km^3$ means that **3,024,338,624  (3.02 x $10^9$) viral PFUs were released per hour per $km^3$ of water into South Puget Sound**.

20.     The IHN virus may remain viable for up to five days in seawater (depending on UV exposure and other factors; (Garver et al. 2013); assuming a 5-day viable lifespan for a viral particle, **3.02 x $10^9$** PFU per hour per $km^3$ equates to **an instantaneous concentration ((5 days)*(24 hours)=120 hours) of 3.62921 x$10^{11}$ total PFU per $km^3$ (=363 per $m^3$) during an outbreak**. Given that a dose of 10 plaque

forming units (PFU) may initiate active infection in exposed juvenile Atlantic salmon, the

risk of disease transmission to native salmonids – even if they are more resistant to

infection – during such an outbreak becomes obvious.  While additional experiments and

analyses are needed to accurately define the likelihood of transmission, it is my opinion

that it is highly likely that at least some ESA-listed salmonids were infected as a result of

this outbreak.

21.     Note that the IHNV viruses released into Puget Sound in 2012 from the

commercial net pens were almost certainly not evenly distributed throughout the water

column - it is likely that due to thermal and density layers (e.g. pycnoclines) that inhibit

vertical mixing, viral particles would have remained concentrated in the upper water

layers near the surface where juvenile salmonids reside.  In addition, the viral

concentrations near the net pens would have been significantly higher due to proximity to

the source (the net pens). This indicates that the concentration of viral particles was

almost certainly higher (potentially many times higher) than the conservative estimate

given above, although this point should be a topic of further research. In addition, the

outbreak occurred in April and May- when juvenile Chinook and coho salmon emigration

nears its peak; the location of these net pens in nearshore waters means that juvenile

Pacific salmon must migrate past them, and their pathogen plumes, while emigrating to

the ocean.

22     IHNV is a highly virulent member of the Rhabdoviridae family, is

naturally occurring from the Pacific Northwest to Russia (Kamchatka), Japan and Korea,

and infects most salmon species and rainbow trout (and steelhead) to varying degrees.

The virus is also found in Europe, presumably as a result of the transfer of infected

rainbow trout from North America (Johansson et al. 2009). Salmon lice (*Lepeophtheirus salmonis*) have been identified as a mechanical vector for the virus (meaning they introduce the virus to new hosts by piercing the skin, but are not internally infected) (Jakob, Barker, and Garver 2011);

23.     There are three clades of IHNV, each typically found in a specific geographic area. The "U" clade (most pathogenic for sockeye and kokanee, as well as Chinook salmon and rainbow trout/steelhead) is common in B.C. and Alaska, the "M" clade (most pathogenic for steelhead/rainbow trout, as well as Chinook salmon) is found in the Columbia River basin and the Olympic Peninsula (including the Chehalis River basin), and the "L" clade (most pathogenic for Chinook salmon) is typically found in southern Oregon and California. Preliminary reports are that the recent outbreaks are in the U clade, and thus pose the greatest risk to sockeye and steelhead, but the virus appears to also have infected farmed coho salmon in B.C. *Juvenile salmon are at the highest risk of mortality from IHNV infection* (Lapatra 1998), although survivors may also act as carriers of the virus and may begin shedding viral particles when stressed; in some cases adult fish have been reported to succumb to the infection.

24.     In summary, given the magnitude and duration of the IHNV outbreak, the proximity of the infected net pens to nearshore habitats utilized by juvenile Pacific salmon, and the proximity of the pens to salmon bearing streams in South Puget Sound, it is highly likely that ESA-listed Chinook salmon and steelhead trout were harmed.

### OTHER POTENTIAL EFFECTS THAT ARE OF CONCERN

25.     In addition to several concerns about the effects of net pens widely noted in the literature  (e.g. release of chemicals, heavy metals, antibiotics released from fish

farms leading to antibiotic resistance (Goa et al. 2012), the use of baitfish in feed pellets which may deplete food supplies for wild salmon, etc.), the several points discussed below deserve further consideration with regard to the net pens in Puget Sound.

26.     It is widely acknowledged that salmon net pen operations have unintentionally released Atlantic salmon into the waters of the Salish Sea since the introduction of marine net pens in the 1980's, though the number of escapees has declined as netting and other practices have improved.  However, concern over the introduction of self-sustaining Atlantic salmon populations derived from net pen escapees has been downplayed over the years, due in part to the failed attempts by state fish and wildlife departments to intentionally introduce the species into the Pacific Northwest from 1904 to 1991 (Waknitz et al. 2002). However, a study in the Tsitika River (a moderate-sized (42-km mainstem length) remote river system on the northeast coast of Vancouver Island, Canada) published in 2000 (Volpe et al. 2000) found juvenile *Atlantic* salmon of two size classes present. That they were Atlantics salmon was confirmed by genetic analysis, and scale analysis suggested that they were the naturally produced offspring of adult Atlantic salmon that had spawned in the river. The study also reported that their dietary intake overlapped almost completely with that of native salmonids in the river, implying that they were competing for resources with the native, wild fish.

27.     A more recent study (Fisher, Volpe, and Fisher 2014) found that Atlantic salmon offspring were present in 36.6% of the 41 rivers surveyed over a three year period, and occupancy models (models were used because detection frequency of species at low abundance is imperfect) suggested that Atlantic salmon were present in 97% of those rivers and streams occupied by diverse assemblages of native Pacific salmon.  The

authors concluded that the continued low-levels of escaped Atlantic salmon in British

Columbia (where salmon farms are numerous and of a much larger scale than in Puget

Sound) posed a threat for the establishment of this foreign species in waters of the Pacific

Northwest, ending "Their [Atlantic salmon] current distribution, and the potential effects

on Pacific ecosystems and native Pacific salmon, is a conservation priority that has been

neglected in the push for economic return" (Fisher, Volpe, and Fisher 2014, pg. 2145).

The authors also pointed out that the habitats encountered in British Columbia are

common from the Oregon coast through southeast Alaska.

28.     A very recent Scandinavian study detailed the capture of farmed Atlantic

salmon infected with two different viruses (salmon alphavirus and piscine reovirus) in a

nearby river after they had escaped from their net pen, highlighting the ability of escapees

to also transmit pathogens directly to the spawning grounds of wild fish (Madhun et al.

2015).

29.     Sea lice, a problematic parasite in British Columbia (little data is available

for Puget Sound), have also been a major source of farmed Atlantic salmon loss in

Norway. Despite intensive research and the development of therapeutic drugs to address

the issue, sea lice control measures are failing in Norway:

http://www.worldfishing.net/news101/industry-news/norway-to-slaughter-sea-lice-

infected-salmon (10/2013).  "The Norwegian authorities have recently ordered that some

two million sea-lice infested farmed salmon in the Vikna district of Nord Trondelag be

slaughtered with immediate effect after becoming resistant to chemical treatments against

the sea-lice parasite.  The action has been prompted specifically to protect wild young

salmon (smolts) migrating through the fjords to the open sea next May and June from

huge numbers of juvenile sea-lice being produced on and released from particular salmon farms that have been unable to control their lice numbers."

30.     Native juvenile salmon (and other fish species) have been shown to congregate around net pen farms due to food availability and shelter from currents, among other reasons  (Fernandez-Jover et al. 2008; Dempster et al. 2009).  This has the potential to increase their exposure to pathogens, and infected fish may then serve as a disease "vector" (a route of disease transmission) over long distances as juvenile salmon migrate to and from the ocean.

31.     In addition to bio-amplifying viruses (and potentially other pathogens), an impact of salmon farming which has only recently gained attention is the potential for salmon raised in net pens to generate more virulent pathogens.  The high rearing densities, continuous introduction of native hosts into the net pens, stress, and lack of selection for resistance (all fish are harvested, rather than breeding those that have a higher natural resistance) found in salmon farming operations result in ideal conditions for viral amplification and the evolution of increasingly pathogenic strains.  This has been reported both for exotic (foreign to the Pacific Northwest) pathogens like Infectious Salmon Anemia Virus (ISAV; Christiansen et al. 2011; Are Nylund et al. 2003; A Nylund et al. 2007) and native (endemic) pathogens like infectious hematopoietic necrosis virus (IHNV;  Troyer and Kurath 2003) and viral hemorrhagic septicemia virus (VHSV;  Einer-Jensen 2004).

32.     NOAA's stated mandate to expand U.S. aquaculture production may undermine adequate supervision of the finfish aquaculture industry:

"The US Government advocates a strong policy for national aquaculture development. The Department of Commerce (DOC) has set specific 25-

year goals to offset the annual $7 billion imbalance in seafood trade, and to double employment and the export value of goods and services. The policy is reflected in strategies proposed by the National Oceanic and Atmospheric Administration (NOAA) and its three line agencies responsible for certification of aquaculture-related activities. With its broad mandate for stewardship of the nation's marine and coastal living resources, NOAA recommends that aquaculture development and environmental protection proceed hand in hand to meet public needs. Thus, in keeping with the Government's firm commitment to the United Nations Food and Agriculture Organization's (FAO) Code of Conduct for Responsible Fisheries, the line agencies of NOAA are encouraging the fisheries and aquaculture sectors to develop national Codes of Conduct, and their sub-sectors to develop and abide by Best Management Practices (BMPs)." (Nash 2001)

33.     Promoting aquaculture poses risks to the existing fishery for Pacific salmon, the associated economic impact, and job creation within the fishery, which were estimated in a press release by Senator Maria Cantwell (2011) following reports of detection of Infectious salmon anemia virus (ISAV) in BC:

"We should not rely on another government – particularly one that may have a motive to misrepresent its findings-- to determine how we assess the risk ISA may pose to American fishery jobs… **One recent study of Pacific salmon estimated the wholesale value of the annual catch at least $2.2 billion dollars, supporting 35,000 harvesting and processing jobs**…With so much at stake, a rapidly spreading virus that causes disease in wild Pacific salmon could be economically and ecologically devastating…While a few scientists may downplay the threat to wild Pacific salmon posed by the ISA infections recently detected in British Columbia, we believe the lessons learned from other recent fish disease outbreaks suggest that ISA should be cause for considerable concern now."  [emphasis added]

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge.

Executed this  19th day of August, 2015.


_____

Todd A. Sandell, M.S., Ph.D.


References cited:

Christiansen, Debes H, Peter S Østergaard, Michael Snow, Ole Bendik Dale, and Knut
    Falk. 2011. "A Low-Pathogenic Variant of Infectious Salmon Anemia Virus
    (ISAV-HPR0) Is Highly Prevalent and Causes a Non-Clinical Transient Infection
    in Farmed Atlantic Salmon (Salmo Salar L.) in the Faroe Islands." *The Journal of
    General Virology* 92 (Pt 4): 909–18. doi:10.1099/vir.0.027094-0.
Dempster, T, I Uglem, P Sanchez-Jerez, D Fernandez-Jover, J Bayle-Sempere, R Nilsen,
    and Pa Bjørn. 2009. "Coastal Salmon Farms Attract Large and Persistent
    Aggregations of Wild Fish: An Ecosystem Effect." *Marine Ecology Progress
    Series* 385 (Fao 2008): 1–14. doi:10.3354/meps08050.
Einer-Jensen, K. 2004. "Evolution of the Fish Rhabdovirus Viral Haemorrhagic
    Septicaemia Virus." *Journal of General Virology* 85 (5): 1167–79.
    doi:10.1099/vir.0.79820-0.
Fernandez-Jover, Damian, Pablo Sanchez-Jerez, Just Tomás Bayle-Sempere, Carlos
    Valle, and Tim Dempster. 2008. "Seasonal Patterns and Diets of Wild Fish
    Assemblages Associated with Mediterranean Coastal Fish Farms." *ICES Journal
    of Marine Science: Journal Du Conseil* 65 (7): 1153–60.
    doi:10.1093/icesjms/fsn091.
Fisher, Alina C, John P Volpe, and Jason T Fisher. 2014. "Occupancy Dynamics of
    Escaped Farmed Atlantic Salmon in Canadian Pacific Coastal Salmon Streams:
    Implications for Sustained Invasions." *Biological Invasions* 16: 2137–46.
Garver, Kyle a, Amelia a M Mahony, Dario Stucchi, Jon Richard, Cecile Van Woensel,
    and Mike Foreman. 2013. "Estimation of Parameters Influencing Waterborne
    Transmission of Infectious Hematopoietic Necrosis Virus (IHNV) in Atlantic
    Salmon (Salmo Salar)." *PloS One* 8 (12): e82296–e82296.
    doi:10.1371/journal.pone.0082296.

Goa, Panpan, Daqing Moa, Yi Luo, Limei Wang, and Lin Xu. 2012. "Occurrence of Sulfonamide and Tetracycline-Resistant Bacteria and Resistance Genes in Aquaculture Environment." *Water Research* 46: 2355–64.

Jakob, E, DE Barker, and KA Garver. 2011. "Vector Potential of the Salmon Louse Lepeophtheirus Salmonis in the Transmission of Infectious Haematopoietic Necrosis Virus (IHNV)." *Diseases of Aquatic Organisms* 97 (2): 155–65. doi:10.3354/dao02414.

Johansson, T, K Einer-Jensen, W Batts, P Ahrens, C Björkblom, G Kurath, H Björklund, and N Lorenzen. 2009. "Genetic and Serological Typing of European Infectious Haematopoietic Necrosis Virus (IHNV) Isolates." *Diseases of Aquatic Organisms* 86 (November): 213–21. doi:10.3354/dao02108.

Lapatra, Scott E. 1998. "Factors Affecting Pathogenicity of Infectious Hematopoietic Necrosis Virus ( IHNV ) for Salmonid Fish." *Journal Of Aquatic Animal Health* 10 (January): 121–31.

Madhun, A S, E Karlsbakk, C H Isachsen, L M Omdal, A G Eide Sorvik, Ø. Skaala, Bjørn T. Barlaup, and K A Glover. 2015. "Potential Disease Interaction Reinforced: Double-Virusinfected Escaped Farmed Atlantic Salmon, Salmo Salar L., Recaptured in a Nearby River." *Journal of Fish Diseases* 38: 209–19.

Mardones, F O, a M Perez, P Valdes-Donoso, and T E Carpenter. 2011. "Farm-Level Reproduction Number during an Epidemic of Infectious Salmon Anemia Virus in Southern Chile in 2007-2009." *Preventive Veterinary Medicine* 102 (3): 175–84. doi:10.1016/j.prevetmed.2011.07.005.

Nash, C. E., ed. 2001. "The Net-Pen Salmon Farming Industry in the Pacific Northwest." U.S. Dept. Commerce; NOAA Tech. Memo. NMFS-NWFSC-49.

Nylund, A, H Plarre M Karlsen, F Fridell, K F Ottem, A Bratland, and P A Saether. 2007. "Transmission of Infectious Salmon Anaemia Virus (ISAV) in Farmed Populations of Atlantic Salmon (Salmo Salar)." *Archives of Virology* 152 (1): 151–79. doi:10.1007/s00705-006-0825-9.

Nylund, Are, M. Devold, H. Plarre, E. Isdal, and M. Aarseth. 2003. "Emergence and Maintenance of Infectious Salmon Anaemia Virus (ISAV) in Europe: A New Hypothesis." *Diseases of Aquatic Organisms* 56: 11–24.

Troyer, Ryan, and Gael Kurath. 2003. "Molecular Epidemiology of Infectious Hematopoietic Necrosis Virus Reveals Complex Virus Traffic and Evolution within Southern Idaho Aquaculture." *Diseases of Aquatic Organisms* 55: 175–85.

Volpe, J P, Taylor, E B, D W Rimmer, and B W Glickman. 2000. "Evidence of Natural Reproduction of Aquaculture-Escaped Atlantic Salmon in a Coastal British Columbia River." *Conservation Biology* 14 (3): 899–903.

Waknitz, F W, T J Tynan, C. E. Nash, R N Iwamoto, and L G Rutter. 2002. "Review of Potential Impacts of Atlantic Salmon Culture on Puget Sound Chinook Salmon and Hood Canal Summer-Run Chum Salmon Evolutionarily Significant Units." U.S. Dept. Commer., NOAA Tech. Memo. NMFS-NWFSC-53.

# Todd Anderson Sandell, Ph.D.

4021 NE 196th St., Lake Forest Park, WA  98155 • (206) 707-2979
todd@wildfishconservancy.org • www/linkedin.com/in/toddsandell

- Ph.D. in Fisheries Ecology (interdisciplinary), Oregon State University (2010); M.S. (2001)
- Data from my dissertation were one component used to develop NOAA's "Ocean Conditions and Salmon Forecasting" ecosystem indicators web page
- Built ecosystem models incorporating qualitative and quantitative environmental factors and pathogen data to forecast  annual infection cycles and correlations with adult salmon populations
- 18 years of experience in fish biology, estuarine and marine ecology, and salmon management
- Participated in oceanographic survey cruises in the California Current for 7 years (2001-2008), including sampling of fish, lower trophic levels and abiotic factors  to inform ecological models
- Since 2011, have designed, managed and implemented a juvenile salmon research project on the Washington coast, including a 2012 spatial analysis of sea level rise due to climate change
- Awarded  $659,000 in research funding from a variety of agencies and foundations since 2011
- Currently have 7 peer-reviewed publications published or in progress
- Dozens of oral presentations of scientific research at regional, national and international meetings

## Selected Work Experience

**NATIONAL MARINE FISHERIES SERVICE (NOAA contractor)**                    Seattle, WA

• *Fisheries Ecologist*. Conducting research to investigate how juvenile salmon are responding to habitat restoration projects in the Snohomish River estuary. Organize and carry out field sampling efforts, pilot boats for beach seining, enter data via GIS ready tablets, collect fish, scales and finclips for diet, growth and genetic studies. Responsible for logistics and equipment maintenance.  2/2015-present.

**WILD FISH CONSERVANCY**                    Duvall, WA

• *Senior Ecologist*.  Conducted estuarine research and provided management recommendations on juvenile fish habitat use and restoration priorities in the Grays Harbor estuary, WA. Led a project to investigate the distribution, abundance, migratory timing, and habitat requirements of juvenile fish in the lower Chehalis River and surge plain. Responsible for grant writing, study design and implementation, permitting, habitat assessment, water quality and genetic sampling, building/managing the database, statistical analysis, project reports and publication. Piloted power boats for beach seining and operated fyke traps. Supervised WFC employees and recruited and trained >25 volunteers and college interns in field methodology and fish identification; mentored two students in projects utilizing field data for college credit. Produced the first detailed study (2012) of sea level rise due to climate change in the estuary to predict shifts in habitat availability through 2100 and inform future fisheries management and conservation efforts. 11/2010-present

**NATIONAL MARINE FISHERIES SERVICE (NOAA contractor)**                    Seattle, WA

• *Fisheries Ecologist*.  Conducted research to investigate the distribution and timing of juvenile salmon habitat residency and the composition of the marine fish community in the Strait of Juan de Fuca, the San Juan Islands, and the Snohomish River estuary. Carried out field sampling efforts with purse seining and tow and lampara netting, piloted small craft for beach seining, built and managed the database, analyzed and presented data at meetings and conferences in fisheries management, and produced summary reports for NOAA and Tribal Nations. Responsible for logistics and equipment maintenance; assisted with federal licensing and a hydroacoustic survey in the Salish Sea via surgical acoustic tag insertion and deployment and retrieval of hydrophones for data upload to the HYDRA online data portal.                    6/2008-10/2010

**OREGON STATE UNIVERSITY, HATFIELD MARINE SCIENCE CENTER**                         Newport, OR
   • _Faculty Research Assistant_.   Studied factors affecting the health, condition and survival of juvenile salmonids in the nearshore NE Pacific Ocean. Ocean trawling for fish; sampled zooplankton and nutrients while at sea aboard contracted commercial fishing vessels; crew for monthly purse seining effort in the lower Columbia River estuary. Assisted with quarterly reports to funding agencies, ESA permitting, data entry and analysis, publication of research results, presentation of data at regional and international meetings, and grant applications. Necropsied thousands of juvenile salmon; conducted viral, bacterial and macroparasitic pathogen analysis via microscopy, nested PCR and quantitative PCR. Trained several high school and college interns in field methodology, dissection, microscopy techniques, DNA extraction, nested and quantitative PCR, and protein quantification.                         2001-2008

**OREGON DEPARTMENT OF FISH AND WILDLIFE**                         Coos Bay, OR
   • _Experimental Biology Aide_ (seasonal).   Performed surveys of spawning Chinook, coho and chum salmon and steelhead trout according to the Ocean Salmon Protocol of ODFW. Identified species, sex, fin marking and reproductive status of adult and jack salmon. Electrofishing for juvenile coho salmon population escapement assessment and monitored weirs and smolt traps. Evaluated and classified potential spawning habitat and hydrology; collected tissue and scale samples from salmonid carcasses. Responsibilities also included communicating with private landowners and stakeholders, navigating over rugged terrain, accurate field notation and maintaining field equipment and state vehicles.                         10/2000-3/2001

**OREGON DEPARTMENT OF FISH AND WILDLIFE**     Corvallis, OR
   • _Experimental Biology Aide_ (seasonal). Performed surveys of pathogens at ODFW hatcheries during spawning. Analyzed samples for _Renibacterium salmoninarum_ (bacterial kidney disease), _Myxobolus cerebralis_ (whirling disease) and IHNV. Cultured bacteria on agar plates, examined samples microscopically, ran ELISAs, and assisted with data entry and record keeping. Traveled to hatcheries in western Oregon for monthly pathogen surveys.                         7/2000-10/2000

**UNIVERSITY OF COLORADO HEALTH SCIENCES CENTER**                         Denver, CO
   • _Research Assistant_.   Studied the onset of autoimmune diabetes in humans and a mouse model. Cultured human and murine T and B cells and dendritic cells; investigated insulin-peptide recognition through cloning, proliferation assays, PCR, ELISA, DNA sequencing, and flow cytometry.                         1995-1997

**INTERACTIVE KNOWLEDGE, INC. (BOWDOIN COLLEGE)**                         Brunswick, ME
   • _Research Assistant_.   Designed a closed biofiltering aquarium for microgravity research aboard the NASA space shuttle. Performed experiments on zebrafish and medaka growth rates and inhibition, food/waste analysis by atomic absorption spectroscopy, pheremone extraction, chemical and biological water purification, bacterial culture, and general system design. Produced annual progress reports and supervised two undergraduate lab assistants.                         1994-1995

**THE NORTHFIELD MOUNT HERMON SCHOOL**                         Northfield, MA
   • _Science faculty_.  Taught four sections of Introductory Biology and Animal Behavior. Co-authored the school's new biology lab manual, _Investigating Life_.  Dorm parent for highly diverse group of students from 9 different countries; science adviser for two independent student projects. Assistant varsity rowing and varsity football coach; head coach of the boy's novice rowing team.                         1992-1994

# Education

**OREGON STATE UNIVERSITY**                                                                  Corvallis, OR
• **Ph.D.  Microbiology (Interdisciplinary Ecology).**
> Committee: Kym Jacobson (NOAA), Jerri Bartholomew (OSU), Alec Maule (USGS), Carl Schreck (OSU/NBS). Researched the estuarine and marine ecology of juvenile salmonids, focusing on the effects of pathogens and parasites on salmon growth and survival during early marine residency. This work showed that infection by the common pathogen *Renibacterium salmoninarum* (causative agent of Bacterial Kidney Disease), in conjunction with parasitic infections, can impair the growth of Pacific salmon in the wild, and that oceanic and atmospheric conditions act in concert to influence the survival of infected fish. Modeled the effects of environmental factors and predation on juvenile survival, annual infection cycles, and correlations with adult survival. Sample analysis via nPCR and qPCR, microscopy, ELISA, and bacterial culture. Conveyed results via presentations at local and national meetings and through publication in peer-reviewed journals. Trained and supervised college interns and volunteers.                    1/2005-6/2010

> • **M.S.  Microbiology.** Studied the dynamics of *Myxobolus cerebralis*, the introduced parasite causing whirling disease in salmonids. Worked with members of the Nez Perce tribe to perform extensive field collections of sentinel fish and benthic invertebrates in NE Oregon, cultured experimental fish, analyzed samples by PCR, and developed a phagocytic immune response assay utilizing immunofluorescence and flow cytometry. Presented data at numerous scientific meetings. Served as a Teaching Assistant in Introductory Biology; trained 4 undergraduates in molecular techniques in the laboratory. 1/1997-5/2000

**BOWDOIN COLLEGE**                                                                          Brunswick, ME
> • **Bachelor of Arts, Biology. English minor.** Independent study in virology and immunology. Assistant Editor of the college paper, the *Bowdoin Orient*. Ice hockey, lacrosse. **Dean's list.**          8/1987-5/1992

# Publications

**Sandell**, T., Fletcher, J., McAninch, A., and T. Beuhrens. "Distribution, habitat utilization and emigration timing of juvenile salmonids in the Grays Harbor (WA) estuary." In preparation for submission to *Transactions of the American Fisheries Society*.

Todd A. **Sandell**, Kym. C. Jacobson, David Teel, and Edmundo Casillas. "Does infection by *Renibacterium salmoninarum* increase mortality in the marine phase of the pacific salmon life cycle?" In preparation for submission to the *Canadian Journal of Fisheries and Aquatic Sciences*, 2014.

Todd A. **Sandell**, David Teel, Joe Fisher, Brian Beckman and Kym C. Jacobson. 2014. "*Renibacterium salmoninarum* and trematode infections are associated with reduced growth of juvenile Chinook salmon in the Northeast Pacific." *Journal of Fish Diseases*, in press.

**Sandell**, T. and K. Jacobson. 2011. "Comparison and evaluation of *Renibacterium salmoninarum* quantitative PCR diagnostic assays using field samples of Chinook and coho salmon." *Diseases of Aquatic Organisms,* Volume 93, 129-139.

**Sandell**, T., Lorz, H., Sollid, S., and J.L. Bartholomew. 2002. "The effects of *Myxobolus cerebralis* infection on juvenile Spring Chinook salmon (*Oncorhynchus tshawytscha*) in the Lostine River, Oregon." In Whirling Disease: Reviews and Current Topics, Bartholomew and Wilson, eds. Published by the American Fisheries Society, Volume 29, 135-141.

Gerwick, L., Steinhaur, R., LaPatra, S., **Sandell**, T., Ortunez, J., Hajiseyedjavadi N., and C. J. Bayne. 2002. "The acute phase response of rainbow trout (*Oncorhynchus mykiss*) plasma proteins in response to viral, bacterial and fungal inflammatory agents." *Fish and Shellfish Immunology*, Volume 12, 229-242.

**Sandell**, T., Lorz, H., Stevens, D., and J.L. Bartholomew. 2001. "The dynamics of *Myxobolus cerebralis* in the Lostine River, Oregon; Implications for resident and anadromous salmonids." *Journal of Aquatic Animal Health*, Volume 13, 142-150.

## Research Reports

Todd **Sandell** and Andrew McAninch, Wild Fish Conservancy. 2012. "Climate Change in the Chehalis River and Grays Harbor Estuary". Prepared for the Chehalis Basin Habitat Work Group and Grays Harbor County.

Todd **Sandell**, James Fletcher, Andrew McAninch and Micah Wait, Wild Fish Conservancy. 2011-13. "Grays Harbor Juvenile Fish Use Assessment." Annual reports prepared for the Chehalis Basin Habitat Work Group, Grays Harbor County and the Washington State Salmon Recovery Office.

## Selected Oral Presentations

Salish Sea Conference 2014, Seattle, WA. "Modeling Sea Level Rise in the Grays Harbor Estuary." Coastal ecology and planning session. Todd Sandell and Andrew McAninch.

Washington State Salmon Recovery Office 2013 Biannual Meeting, Vancouver, WA. "Grays Harbor Juvenile Fish Use Assessment: Applying what we've learned to habitat conservation, planning and fisheries management." Todd Sandell, James Fletcher, Andrew McAninch and Micah Wait.

American Fisheries Society 2011 Annual Meeting, Seattle, WA. "The effect of ocean conditions on bacterial kidney disease infections in early marine phase Chinook and Coho salmon." Todd Sandell, Joe Fisher, Brian Beckman, and Kym Jacobson.

American Fisheries Society National Meeting, Anchorage, Alaska, September 11-15, 2005."A regional comparison of Bacterial Kidney Disease among juvenile Chinook salmon in the Northeast Pacific." T. Sandell, K. Jacobson, J. Orsi and E. Casillas.

North Pacific Marine Science Organization (PICES) 13th annual meeting, Honolulu, Hawaii, October 14-24, 2004. "The distribution and prevalence of Bacterial Kidney Disease (*Renibacterium salmoninarum*) in juvenile Chinook and coho salmon in the Northeast Pacific Ocean." T. Sandell, K. Jacobson, D. Teel and E. Casillas.

American Geophysical Union/Ocean Sciences Meeting, Portland, Oregon, February 6-9, 2004. "Pathogens of juvenile salmonids in the near-shore Northern California Current (NCC) System." T. Sandell, M. House, K. Jacobson and E. Casillas. *Eos Trans. AGU,* 84(52), Ocean Sci. Meet. Suppl., Abstract OS21J-05.

## Research Awards and Funding

Grays Harbor Juvenile Fish Use Assessment, 2011- 2013. $200,000 annually (WA RCO).
Grays Harbor Juvenile Fish Use Assessment, 2011- 2013. $40-50,000 annually (USFWS).
Risk Assessment for the Introduction of Viral Pathogens via Farmed Atlantic Salmon, 2012-14. $60,000.
Markham Research Fellowship, Hatfield Marine Science Center, 2005-'07. Award amount: $10,000
John L. Fryer Award in Microbiology, 2007. Award amount: $1,000
James L. Winton Award for Fisheries Pathology, 2006. Award amount: $1,000
Oregon Flyfisher's Scholarship, 2006. Award amount: $4,500

## Professional Affiliations

Member of the Coastal and Estuarine Research Federation, the American Fisheries Society, the American Association for the Advancement of Science, and the Wild Steelhead Coalition.

## Other Qualifications

Experienced with Microsoft Excel, Word, Access (database creation and management), SigmaStat, StatView, StatGraphics, EndNote, PCOrd, and Tableau software; currently learning R statistics. Proficient in Spanish.

## Personal Information

Enjoy white water rafting, jazz, fly fishing, woodworking, cooking, ice hockey, and razor clamming.
Colorado Outward Bound School, Alpine Mountaineering, 1991.

## Boat and Sampling Experience

<u>2011- 2014</u>:    As project leader, trailered and piloted power boats (20' and 14') for beach seining effort in the Grays Harbor estuary and lower Chehalis River during every low tide series from March-September, 2011-13 (~100 days/year); operated fyke traps in tidal sloughs. Trained college interns in small vessel safety; trained  WFC employees in small vessel operation and trailering, beach seining, engine repair, and routine maintenance and winterization.

<u>2008-1/2010</u>:    Deck boss as part of a large-scale NOAA juvenile fish sampling project in the San Juan Islands (56' purse seiner) and Strait of Juan de Fuca, WA.  Also piloted and trailered power boats while assisting with various beach seine, purse seine, and trawl sampling efforts around Puget Sound and the Snohomish River, WA. Sampling of zooplankton assemblage (ring nets), water quality. Assisted with deployment and retrieval of acoustic hydrophones in Puget Sound and general engine maintenance.

<u>2001-2008</u>:    Ocean sampling off Oregon and Washington aboard contracted commercial fishing vessels (10-20 day trips in May, June, August, September of each year) as part of the BPA Columbia River Plume study and GLOBEC. Fish trawls, nutrient sampling, zooplankton and phytoplankton sampling (ring, bongo and neuston nets), species identification, data collection and data entry. Concurrent estuary purse and beach seine sampling (every two weeks) in the lower Columbia River estuary. Assisted with various beach seining, electro-shocking projects along the OR coast.

<u>1992-94</u>:    Rowing coach at the Northfield Mt. Hermon School, MA. Daily operation of (decrepit) motor boats, lots of experience with outboard engine troubleshooting.

<u>1993</u>:    Waterfront director and whitewater canoeing instructor, Camp Moosilauke, NH.  Oversaw 5 waterfront staff, taught canoeing, kayaking, sailing; led remote whitewater canoe trips.

<u>1991</u>:    Guest of the first class cadets sailing the USCG tall ship ***Eagle*** across the Atlantic as part of a training cruise; set, reefed sails in all weather, learned introductory navigation.

<u>1984-88</u>:    East Lyme High School Rowing program; stroke alternate for the 1987 national champion heavyweight sweep 4. Sculled for Blood Street Sculls Rowing Club, Old Lyme, CT in summer.

<u>1987-88</u>:    Ran a lobster trap line in Long Island Sound, CT.

<u>1986</u>:    Graduated from the USCG small boat sailing training course, New London, CT.

*Personal:* Avid whitewater rafter and former kayaker. Have run the Green River (Desolation Canyon, UT), Delores River (CO), Colorado (Grand Canyon, AZ), Middle Fork of the Salmon River (ID), Ashuapmushuan River (Quebec), Rogue River (OR), Allagash (ME), Rapid (ME), and Deschutes (OR), among others.

## Certifications

Current with First Aid and CPR (Red Cross, Seattle).
Completed 3 Ocean Safety and Survival Courses (U.S. Coast Guard Auxiliary, Newport, Oregon).
Completed the NOAA Small Boat Safety Component Class (NOAA, Seattle), 2008.
NOAA "Drive Safe" training completed 2009.
Washington State Boater's Card (#00015451).
Washington state driver's license (#SANDETA301D3)