UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

WILD FISH CONSERVANCY,

            Plaintiff,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al.*,

            Defendants, and

COOKE AQUACULTURE PACFIC,

            Defendant-Intervenor

NO.  15-CV-1731 BJR

ORDER DENYING (1) FEDERAL
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS
AND (2) COOK AQUACULTURE'S
MOTION TO DISMISS

## I.    INTRODUCTION

This matter comes before the Court on (1) a Motion for Judgment on the Pleadings filed by Defendants U.S. Environmental Protection Agency ("EPA" or "the Agency") and National Marine Fisheries Service ("NMFS" or "the Service") and the named individual Defendants (collectively, "Federal Defendants"); and (2) a Motion to Dismiss filed by Intervenor-Defendant Cooke Aquaculture Pacific ("Cooke"). Both motions seek dismissal of all claims set out in the Second Amended and Supplemental Complaint filed by Plaintiff Wild Fish Conservancy ("WFC" or "the Conservancy"), Dkt No. 57. Having reviewed the briefs,

1   declarations, and exhibits filed in support of and opposition to these motions, and having heard

2   oral argument by the parties, the Court finds and rules as follows.

3                          **II.    BACKGROUND**

4           A.   Summary of Issues

5           This case involves the intersection of two federal statutes, the Clean Water Act, 33

6   U.S.C. §§ 1251, *et seq.* ("CWA") and the Endangered Species Act, 16 U.S.C.A. §§ 1531 *et*

7   *seq.* ("ESA"). At issue is whether the Federal Defendants in this case have met their

8   consultation obligations under Section 7 of the ESA in their review of Washington's sediment-

9   related water quality standards adopted under the CWA. In particular, Plaintiff's complaint

10  focuses on the potential effects of those standards, and the commercial salmon farms Plaintiff

11  alleges they enable, on threatened salmonid species in Puget Sound. Plaintiff's claims can be

12  grouped into two independent theories of recovery: (1) that the Federal Defendants'

13  consultation in 2011 regarding the effects of Washington's revisions to its water quality

14  standards did not meet the requirements of the ESA and must be performed again; and (2) that

15  regardless of the adequacy of the 2011 consultation, events since 2011 have occurred that

16  trigger the Federal Defendants' duty to reinitiate a consultation regarding those same

17  standards. Plaintiff's objective in this lawsuit is to obtain a court order directing the Federal

18  Defendants to consult, using the best science currently available, on the potential effects of

19  Washington's revisions to its sediment quality standards on species listed as threatened or

20  endangered under the ESA. The Defendants deny that the 2011 consultation was inadequate,

21  and claim they lack authority to reinitiate consultation.

22          Under the CWA, states are directed to develop, adopt, implement, and periodically, to

23  revise, a variety of standards governing the waters within their boundaries; EPA in turn is

24  directed to review those standards and revisions, approve or disapprove them, or in some

25  circumstances promulgate its own. 33 U.S.C. § 1313(c), 40 C.F.R. § 131.20. Section 7 of the

ESA requires EPA (and all federal agencies) engaging in an action that may affect listed

species to consult with the relevant service—the Fish and Wildlife Service where terrestrial and freshwater species may be involved, and NMFS for marine species, including the listed salmonids at issue in this case—on the effects of that action. 50 C.F.R. § 402.14. If the consultation indicates that the proposed activity is likely to jeopardize a listed species, the agency must identify reasonable alternatives to avoid the action's negative impacts. 16 U.S.C. § 1536(a)(2) & (b)(3)(A).

The CWA-mandated water quality standards governing Washington waters include, among other things, standards related to the management of sediment, which Washington first adopted in 1991. Sec. Am. Compl., ¶ 52. In 1996, Washington revised those sediment management standards, creating an exemption for salmon farms in Puget Sound from compliance with generally applicable sediment management guidelines. *Id.* ¶¶ 53-54. The EPA, after a long delay, litigation detailed below, and an informal consultation with NMFS, provided its approval of the revisions in 2008 and after Plaintiff's successful legal challenge to that approval, again in 2011. *Id.* ¶¶ 54-61.

Plaintiff Wild Fish Conservancy is a nonprofit advocacy organization, "dedicated to the preservation and recovery of the Northwest's native fish species and the ecosystems upon which those species depend." *Id.* ¶ 8. The Conservancy alleges that the salmon farms in Puget Sound jeopardize the continued existence of listed wild salmonids in Washington. *Id.* ¶¶ 47-49. It argues that EPA should not have approved the revised standards, exempting salmon farms from compliance with sediment standards, and challenges both the procedure EPA and NMFS followed in the review, consultation, and approval of those revisions, and the substantive result of that process.

The Conservancy's complaint contains four causes of action. In the first, the Conservancy claims that EPA's consultation with NMFS in 2011 regarding revisions to Washington's water quality standards was inadequate, and that NMFS's concurrence in EPA's approval was arbitrary, capricious, and an abuse of discretion. Sec. Am. Suppl. Compl., ¶¶ 80-

3

83. Plaintiff's second and third causes of action claim that EPA and NMFS, respectively, violated the ESA by failing to reinitiate consultation regarding the likely effects of the approval of the 1996 revisions, in light of recent events related to the salmon farms. *Id*. ¶¶ 84-88. The fourth cause of action alleges that EPA failed to meet its substantive duty under the ESA to ensure its actions in approving the standards would not jeopardize listed species. *Id*. ¶¶89-91.

Defendants seek dismissal of all four causes of action. The Federal Defendants claim they had no duty to consult on approval of the 1996 revisions, and that the scope of the consultation in any event would not extend to the potential effects of salmon farms on listed species. Intervenor-Defendant Cooke also argues the Conservancy's first and fourth causes of action are barred by *res judicata*, based on a 2010 decision of this Court involving the same parties and similar claims at issue here. All Defendants argue that the federal agencies have no duty to reinitiate consultation because EPA lacks the "discretionary involvement and control" over the approval action necessary to trigger such duty, and NMFS lacks the authority to reinitiate consultation under any circumstances.

B. Legal Framework

1. *The Clean Water Act*

The purpose of the Clean Water Act was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA established a cooperative process between state and federal regulators, whereby each state is required to adopt and periodically revise water quality standards applicable to waters within its borders, including water quality goals and pollution controls, which it must then submit to EPA for review. *See* 33 U.S.C. § 1313(c). Under the CWA, EPA then has 60 days to review the proposed standards or revisions for consistency with the CWA's requirements and either approve them, or disapprove them and notify the state of required changes. *Id*. § 1313(c)(3). If the EPA rejects a state's proposed water quality standards and the state fails to adopt the required changes within 90 days, the Agency itself promulgates the standards. *Id*. § 1313(c)(4).

The Agency also has the discretion *sua sponte* to promulgate new or revised standards for a state if it determines such standards are necessary to meet the requirements of the CWA. 33 U.S.C. § 1313(c)(4)(B).

### 2. *Endangered Species Act*

Congress enacted the Endangered Species Act in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(b). The ESA was enacted in 1973 to prevent the extinction of fish, wildlife, and plant species that have been so depleted in numbers that they are in danger of, or threatened with, extinction. 16 U.S.C. § 1531(a), (b); *see generally Tennessee Valley Auth. ("TVA") v. Hill*, 437 U.S. 153 (1978). The Endangered Species Act declares it "to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the ESA. 16 U.S.C. § 1531(c). The legislative history of the ESA "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species" and "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *TVA v. Hill*, 437 U.S. at 185.

In furtherance of these objectives, Section 7(a) of the ESA imposes on every federal agency a substantive duty "to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species, or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). The ESA also imposes a procedural duty on the "action agency" to consult with the "consultation agency," meaning either FWS or NMFS depending on the species involved, if the agency's action "may affect" a listed species. 50 C.F.R. § 402.14(a); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir.1994). The ESA generally requires a formal consultation, which includes a study and a biological evaluation of

the agency action and its potential effects, and the development and adoption of methods for avoiding or mitigating such effects. 50 C.F.R. § 402.14. A formal consultation is not required, however, if after informal consultation, which may include conversations and correspondence between the agencies, both agencies determine that the proposed action may affect but "is not likely to adversely affect" the listed species. 50 C.F.R. § 402.14(b)(1). If the agencies do not agree that the agency action "is not likely to adversely affect such species," the regulations require that the agencies undertake formal consultation, and identify reasonable and prudent alternatives that will avoid the action's anticipated adverse effects. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.13(a); *Turtle Island v. Nat'l Marine Fisheries Serv*., 340 F.3d at 974.

Relevant to this case, ESA regulations also place additional, ongoing obligations on the action agency and—Plaintiff argues—the consulting agency, to reinitiate consultation under certain circumstances. Specifically, "[r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law" if, among other potential triggering events, "a new species is listed or critical habitat designated," or "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16.

C.  Factual and Procedural Background

The EPA first approved Washington's sediment management standards, one element of the state's comprehensive network of water quality standards, in 1991. Sec. Am. Compl., ¶ 52, *citing* Wash. Admin. Code ch. 173-204. The regulations provided, among other things, for the establishment of quality standards, management, and cleanup of contaminated sediments in Washington's waterways. Wash. Admin. Code ch. 173-204. In 1995, Washington adopted revisions to its 1991 water quality standards, which it submitted to EPA for approval in 1996. These 1996 revisions amended sediment source control provisions to exclude "Marine Finfish

Rearing Facilities"—or net pens operated by commercial salmon farms in Puget Sound—from generally applicable sediment management standards. Wash. Admin. Code 173-204-412. Plaintiff alleges that "[t]his regulation was intended to enable the issuance of permits to commercial salmon farms in Puget Sound that would not require the facilities to implement what was perceived as costly pollution control measures." Sec. Am. Compl., ¶ 53.

Although EPA was required under the CWA to review and approve or disapprove the 1996 Washington revisions within 60 days of submission, for reasons that are not clear from the record, it did not do so until some twelve years later, and only after the Conservancy filed a lawsuit in 2008 to enforce that requirement. *Id*. ¶ 54. In the interim, (although Plaintiff claims it should not have), Washington has treated the 1996 revisions as the applicable water quality standards of the state, issuing permits to salmon farms under the exemption from generally applicable sediment quality guidelines. *Id*. ¶ 55. After the Conservancy filed suit in 2008, EPA approved Washington's revised standards within a matter of months, after informal consultation with NMFS and a determination that an approval was "not likely to adversely affect" any listed species, including the three salmonid species in Puget Sound listed as threatened under the ESA: the Puget Sound Chinook salmon, Hood Canal summer-run chum salmon, and Puget Sound steelhead. *See Wild Fish Conservancy v. U.S. Envtl. Prot. Agency*, No. C08-156 JCC, 2010 WL 1734850 (W.D. Wash. 2010) ("*WFC I*").

In *WFC I*, the Conservancy challenged EPA's 2008 informal consultation and approval of the 1996 revisions. In 2010, in a ruling on cross motions for summary judgment, Judge Coughenour held that EPA and NMFS had violated the ESA by failing to use the "best available scientific and commercial data" in their informal consultation process. Judge Coughenour ruled on narrow grounds, finding that the agencies' failure to consider two NMFS studies, the Salmon Recovery Plan and Orca Recovery Plan, was sufficient grounds for setting aside EPA's 2008 consultation and approval. He ordered the federal agencies to reconsider their concurrence that a formal consultation was not required, "this time taking into account the

best available science." *Id.* at \*8. Because the narrow finding was sufficient basis for setting aside the approval and requiring EPA to conduct the process anew, Judge Coughenour declined to rule on the parties' remaining arguments. *Id.* at \*7.

In 2011, this time incorporating the two additional studies (and several other documents not considered in 2008), EPA again approved the 1996 revisions. EPA did so having again found, in informal consultation with and concurrence from NMFS, that the revisions were "not likely to adversely affect listed species." Sec. Am. Compl., ¶¶ 60-63. Again, EPA concluded it was not necessary to conduct a formal consultation as to whether its approval of Washington's 1996 sediment management revisions would affect threatened Puget Sound salmonids. It is this informal consultation, and EPA's approval resulting from it, that Plaintiff challenges in this lawsuit.

As a distinct, independent theory of recovery, Plaintiff also challenges the Federal Defendants' failure to reinitiate consultation under the ESA, as discussed above, in response to events that have occurred since the 2011 approval. The events include, in 2012, an outbreak of an infectious virus ("IHNv") at several of the salmon farms which, Plaintiff alleges, served to amplify transmission to and among wild salmon populations. Sec. Am. Compl. ¶¶ 64-48. A second event that Plaintiff alleges should have triggered the Federal Defendants' duty to reinitiate consultation was the collapse of one of Defendant-Intervenor's net pens in August 2017, resulting in the release of between 160,000 and 305,000 Atlantic salmon into Puget Sound. *Id.* ¶¶73-77. Plaintiff alleges the escaped Atlantic salmon, and efforts to recover them, threated the food source, habitat, and health of listed salmonids. *Id.* ¶¶ 74-75. Additionally, in 2016 NMFS designated a critical habitat for listed Puget Sound Steelhead; Plaintiff claims this action too should have triggered reinitiation of consultation. *Id.* ¶ 70.

# III. DISCUSSION

A. <u>Standard on a Motion for Judgment on the Pleadings and Motion to Dismiss</u>

Defendant-Intervenor Cooke's Motion to Dismiss is presumably brought under Fed. R. Civ. P. 12(b)(6), which authorizes dismissal for failure to state a claim upon which relief can be granted. Federal Defendants make their motion based on Fed. R. Civ. P. 12(c), which similarly, authorizes a party to move for a judgment on the pleadings after pleadings are closed. ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.").[1] Analysis under Rule 12(c) is "substantially identical" to analysis under Rule 12(b)(6) because, under both rules, "a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

Under both rules, a motion shall be granted when, "accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). A court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under either rule, a court may consider documents outside the pleadings that are matters of public record based on "sources whose accuracy cannot reasonably be questioned." *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

---

[1] Defendants have answered Plaintiff's complaint and first amended complaint. Defendants have not answered Plaintiff's most recent Second Amended and Supplemental Complaint, which was filed on December 17, 2017, based on this Court's direction that they need do so only if, and within 14 days after, this Court denies the Defendants' motions to dismiss. Given this unusual order of proceedings, Federal Defendants make their 12(c) motion, in the alternative, under Fed. R. Civ. P. 12(b)(6). The Court need not decide the appropriate governing rule, however, as the standard is the same.

*B. The Doctrine of* Res Judicata *Does Not Bar Plaintiff's Claims*

Intervenor-Defendant Cooke Aquaculture argues that the claims articulated in the Conservancy's First and Fourth Causes of Action "were litigated to a final judgment in 2009 [*sic*] and are barred by *res judicata*." Cooke Mot. to Dismiss at 17. Those two causes of action challenge, respectively, NMFS's "informal consultation with EPA that concluded with NMFS's April 8, 2011, concurrence letter" and EPA's alleged failure to ensure no jeopardy to listed species based, in part, on its 2011 approval of the Washington water quality standards.[2] Sec. Am. Supp. Compl., ¶¶ 80-83; 90-91. Cooke argues that these claims were settled by Judge Coughenour in *WFC I*, in which Wild Fish Conservancy, the same plaintiff in this case, sued EPA and NMFS, the same defendants in this case. *See Wild Fish Conservancy v. U.S. E.P.A.,* No. C08-0156-JCC, 2010 WL 1734850.

In *WFC I*, the Conservancy argued that EPA and NMFS had "violated the Clean Water Act and the Endangered Species Act by approving Washington State regulations which exempt Puget Sound salmon farms from general sediment-management standards." *Id*. at *1. The claims in that amended complaint related to EPA's 2008 approval of revisions to the standards, and challenged the approval on multiple grounds. Ultimately, Judge Coughenour found it necessary to rule on only one, finding that "the Fisheries Service and EPA ignored a salmon recovery plan and an orca recovery plan" constituting the best available science at the time, and holding that in doing so, "the agencies thereby ran afoul of the Endangered Species Act." *Id*. at *6. Based on this finding, Judge Coughenour set aside EPA's 2008 approval, and ordered the defendants "to re-consider whether formal consultation is required"—in other words, to conduct an informal consultation again to determine whether EPA's approval would be likely to adversely affect listed species—"this time taking into account the best available science." *Id*.

---

[2] The Court notes that Plaintiff's Fourth Cause of Action is also based in part on EPA's alleged failure to reinitiate consultation in light of 2012, 2016, and 2017 events, which Cooke does not (and could not) argue was resolved in 2010; a ruling in Cooke's favor on the *res judicata* issue at this stage would not, therefore, result in dismissal of this claim. *See* Sec. Am. Compl. ¶ 90.

at *8. Because the agencies' failure to use the best available science decided the case, Judge Coughenour explicitly declined to rule on any of the Conservancy's remaining claims, "none of which affects the Court's holding." *Id*. at *7. Cooke claims the case now before the Court "raises all the same claims [the Conservancy] brought in 2008 and litigated to a final judgment." Cooke Mot. to Dismiss at 4.

The doctrine of *res judicata*, also referred to as claim preclusion, serves as an affirmative defense where a party can demonstrate that in the two cases at issue, there are "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917–18 (9th Cir. 2012)(citations omitted). Cooke's *res judicata* argument fails for lack of the first two of these three essential elements.

First, the claims in *WFC I* and the case now before the Court are not identical. In determining whether there is an identity of claims for claim preclusion purposes, the operative criteria for consideration are: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right;" and, mostly importantly, "(4) whether the two suits arise out of the same transactional nucleus of facts." *Id*. at 918. The inquiry into the fourth criterion "is essentially the same as whether the claim could have been brought in the first action," and "whether they could conveniently be tried together." *Id*.

While from 30,000 feet it can be said that both cases relate to the adequacy of the interagency consultation regarding Washington's 1996 revisions to its water quality standards, and EPA's subsequent approvals of those standards, it cannot be denied that the two cases have sought this Court's judgment on two entirely separate and distinct agency actions: the first that occurred in 2008, and the second in 2011. While Cooke attempts to elide the two events—"As it does here, [in *WFC I*] Plaintiff challenged EPA's 2008 approval of the net pen sediment

management standards"—it simply cannot be said that the claims here "arise out of the same transactional nucleus of facts." Plaintiff is *not* challenging the EPA's 2008 approval in the case now before this Court. There are certainly overlapping facts and law involved in the two cases. But without a time machine, the instant case, which challenges a 2011 action, could not have been brought in 2008. *See* Sec. Am. Supp. Compl. ¶¶ 60&61 ("EPA submitted an updated biological evaluation to NMFS dated December 13, 2010 . . .. By letter and findings dated April 8, 2011, NMFS concurred with EPA's conclusion."); *cf. Turtle Island*, 673 F.3d at 918 (Plaintiff "could have conveniently brought claims for NEPA and ESA violations when it filed its complaint in *Earth Island III* in 1998.").

Critically, as Cooke points out, in response to Judge Coughenour's 2010 order, "EPA *updated* its 2008 biological evaluation." Cooke Mot. at 6 (emphasis added). The 2011 consultation was not a mere *pro forma* repeat of the 2008 consultation, with the added consideration of two discrete studies as ordered by Judge Coughenour. According to Cooke, the second consultation was in fact a materially different process. Distinct from the 2008 consultation, the 2011 consultation included a review of the two recovery plans, plus "the science concerning the risk of sea lice infestations in Puget Sound" and "217 publications related to marine finfish rearing collected by Plaintiff that it submitted *after NMFS had rendered its concurrence in 2008*. . . . It also considered potential impacts on species listed on the endangered species list *after its 2008 decision*." *Id.* (emphases added). The two "transactional nuclei of facts" related to the consultations at issue in *WFC I* and in this case are not only distinct in time, but in substance as well.

Second, and independently fatal to Cooke's *res judicata* argument, Cooke also cannot demonstrate that there was "a final judgment on the merits" in *WFC I* of the claims raised in this case. Other than the narrow question of whether the agencies used the best available science in the 2008 consultation by failing to rely on the salmon and orca recovery plans, none of the Conservancy's other claims in *WFC I* can be said to have been litigated to final

12

judgment. Cooke asserts that "[f]ollowing production of a 2,677-page record, Judge Coughenour ruled . . . that EPA's consultation with NMFS under the ESA was inadequate for a single reason," and "[a]fter a full review of the extensive record . . . Judge Coughenour found only one flaw with that earlier approval," implying he rejected the Conservancy's other claims. Cooke Mot. at 5; Cooke Reply at 8-9. In *WFC I*, however, the Conservancy did not "fail[] to persuade Judge Coughenour on any other issue," as Cooke characterizes the ruling. Cooke Reply at 10. On the contrary, Judge Coughenour took pains to clarify that he was *not* holding that aside from the omission of the two recovery plans, the agencies' consultation was based on the best available science and therefore legally adequate. Instead, Judge Coughenour explicitly declined to rule on the Conservancy's other claims because additional rulings would not have affected the Court's decision to set aside the consultation. *WFC I* at *7 ("The parties' lengthy briefs contain many other arguments, none of which affects the Court's holding. . . . Principles of judicial forbearance counsel against further discussion.").[3] Because Judge Coughenour's judicial restraint concerning Plaintiff's remaining claims cannot be construed as a final judgment against them, Cooke's *res judicata* argument fails.

---

[3] On a related issue, the Conservancy has filed a surreply, asserting that Cooke has raised an estoppel argument for the first time in its Reply, and asking the Court to strike this argument or allow the Conservancy an opportunity to respond. In its surreply, the Conservancy claims "Cooke argues for the first time in its Reply that a 1998 order from the Washington's [*sic*] Pollution Control Hearings Board, [("PCHB"),] precludes 'issues' in this case." Pl. Surreply at 2. In its Reply, Cooke does refer to a "1997 PCHB Decision," which the Court understands to be a reference to the PCHB "Findings of Fact, Conclusions of Law and Order" entered in 1998, filed as Exhibit 2 to the Spencer Declaration at Dkt. No. 73. *See* Cooke Reply at 9. Cooke claims that the "PCHB heard multiple expert witnesses over eighteen days of hearings, and ruled against Plaintiff on all issues." The Conservancy objects to Cooke raising this argument for the first time on reply, which is appropriate grounds for this Court to strike it. *See, e.g., Bach v. Forever Living Prod. U.S., Inc.*, 473 F. Supp. 2d 1110, 1122 n.6 (W.D. Wash. 2007)("It is well established in this circuit that courts will not consider new arguments raised for the first time in a reply brief."). The Court finds Cooke's intention in referencing the PCHB decision, however, unclear. Cooke does not cite specific language in the 45-page document, or propose any legal framework by which it may be asking the Court to assess the import of the decision, and the Court declines to wade through the decision to discern one.

C. <u>EPA Had a Duty to Consult With NMFS Regarding Review and Approval of the 1996 Revisions to Washington's Sediment Management Standards</u>

Defendant EPA argues that although it did consult with NMFS in 2011 (and in 2008) regarding the 1996 revisions to the Washington sediment management standards, it did not have a duty to do so, and that absent such duty, all four of Plaintiff's claims must fail. The Agency's position that it had no duty to consult appears to be based on two distinct premises: (1) there was no "agency action" for ESA purposes because the approval did not "authorize, fund, or carry out the permitting or licensing of net pens, [or] establish specific requirements for net pens," Fed. Defs. Motion at 18-20; and (2) "the applicable standard was set in 1996 and there was no change to the environmental baseline when EPA made its 2011 approval." Fed. Defs. Reply at 7. The Agency also claims that any duty to consult would not have included a review of the potential effects of net pens, including disease and escapement, on listed species.

The Court rejects all of these flawed arguments. That EPA has a duty to consult under Section 7 of the ESA on its review of state water quality standards is a settled issue, as the Agency's own regulations have observed. *See EPA Review and Approval of State and Tribal Water Quality Standards*, 65 Fed. Reg. 24641-01 (2000) ("EPA's approval of new and revised State and Tribal water quality standards is a Federal action subject to the consultation requirements of section 7 of the Endangered Species Act."). Judge Coughenour's ruling in *WFC I* confirmed that "[u]nder the Clean Water Act, the EPA has the responsibility of approving or disapproving proposed state water-quality standards. Because the proposed standards in this case potentially affected certain endangered wild salmon populations, the Endangered Species Act required that the EPA consult with the Fisheries Service, either formally or informally, before reaching a final decision." *WFC I*, 2010 WL 1734850, at *2.

More specifically, in this case, the scope of the required consultation with NMFS regarding the 1996 revisions to Washington's sediment management standards includes the effects of net pens, as EPA previously acknowledged in *WFC I*. *See* Fed. Defs. Combined Cross Mot. for Summ. Judgment, *Wild Fish Conservancy v. U.S. E.P.A.*, JCC 08-156, Dkt. No.

59 at 1 ("As required by the ESA, the agencies consulted and considered the possible adverse effects of net pen operations on threatened or endangered species in Puget Sound."). And more specifically still, the effects of net pens include potential disease and escapement—again, as EPA has previously acknowledged, both in judicial proceedings before Judge Coughenour, and by its actions. *Id.* at 8 ("EPA's Biological Evaluation specifically analyzed the potential adverse effects of water quality degradation related to net pen operations, the transfer of sea lice from farmed salmon to wild salmon, and the impacts of escaped farmed salmon on competition for food and other resources."); *see also* Fed. Defs.' Ex. A, EPA Approval Letter re: Washington's Revised Sediment Management Standards and Technical Justification, September 18, 2008 at 9 ("An increased incidence of disease among wild fish in Puget Sound is considered a low risk by NOAA and there have been few documented cases of this actually occurring. . . ."); *id.* at 10 ("There has been only one escapement event in Puget Sound since 2000 as best management practices have helped prevent the unintentional release of Atlantic salmon from netpens. . . ."). These observations reflect EPA's position that the effects of net pens, including potential disease and escapement, are properly within the scope of a consultation, which the regulations provide shall include the "direct and indirect effects of an action," including "activities that are interrelated or interdependent with the action." 50 C.F.R. § 402.02. The Agency's *post hoc* claim in this litigation that its prior consultations were "voluntary," and that it had no duty to review the effects of net pens, including disease and escapement—and in fact, no duty to conduct a consultation at all—is simply not credible.

The Agency argues that (1) its approval did not change the "environmental baseline," which was set in 1996 when Washington adopted the revisions, and therefore it had no duty to consult; and (2) the approval was not a "but for cause of net pens because those facilities existed before EPA's approval action." Fed. Defs. Reply at 8. The Agency, however, has failed to articulate why the Court should disregard EPA's two prior consultations, the aforementioned

admissions, and Judge Coughenour's previous holding in *WFC I*.[4] Furthermore, the

fundamental flaw in EPA's "baseline" and "but-for cause" arguments is that under the CWA,

EPA must review and approve *or disapprove* the revisions. While an approval may not have

changed the standards governing Washington waters, a disapproval certainly would have. The

Agency's position—which would have the question of whether or not an agency has a duty to

consult turn on the outcome of a consultation—borders on the frivolous. The Court therefore

reaffirms that EPA's review and approval process of the 1996 revisions was an "agency

action" under the ESA, triggering EPA's duty to consult with NMFS pursuant to Section 7(a)

of the ESA, and that such consultation necessarily includes the effects of net pens, including

potential disease and escapement.

   D. EPA Retained Sufficient "Discretionary Involvement or Control" Over the Action to
      Implement Measures to Benefit Listed Species

   In addition to the duty to consult on any discretionary action that may affect a listed

species, the ESA also imposes a duty to reinitiate consultation of prior actions under certain

circumstances, including, of relevance to this case, when "new information reveals effects of

the action that may affect listed species or critical habitat in a manner or to an extent not

previously considered," or "a new species is listed or critical habitat designated that may be

affected by the identified action." 50 C.F.R. § 402.16(a)&(d). If one (or more) such triggering

event occurs, the reinitiation "of formal consultation is required and shall be requested by the

Federal agency or by the Service," but only "where discretionary Federal involvement or

control over the action has been retained or is authorized by law." 50 C.F.R. § 402.16.

---

[4] EPA's reliance on *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644
(2007), is misplaced. That case concerned EPA's obligation to consult on a matter in which, the Court found, EPA
had no discretion. *Id*. at 665 (finding obligation to consult only on "actions in which there is discretionary Federal
involvement or control"), *citing* 50 CFR § 402.03. Here, the parties do not dispute that EPA had (and has)
discretion in the process of reviewing and approving, or disapproving, a state's water quality standards.

Plaintiff's Second and Third Causes of Action allege a failure by EPA, in the Second Cause of Action, and NMFS, in the Third, to reinitiate a required consultation concerning the 2011 approval of the 1996 revisions, in light of events that have occurred since the approval. Sec. Am. Compl. ¶¶ 84-88. As discussed above, those events include a viral outbreak among farmed salmon in Puget Sound in 2012, and the failure and collapse of a net pet in 2017, resulting in the release of potentially hundreds of thousands of Atlantic salmon into Puget Sound. *Id*. ¶¶ 64-79. In addition, NMFS designated critical habitat for Puget Sound steelhead in 2016, also triggering, Plaintiff alleges, the Federal Defendants' duty to reinitiate consultation. *Id*. Defendants seek dismissal of the Second and Third Causes of Action, arguing that neither EPA nor NMFS has a duty to reinitiate consultation on the 2011 approval of the 1996 revisions, because EPA lacks the requisite "discretionary involvement or control" over the process of reviewing and approving the 1996 revisions.

The parties disagree on the standard that should govern this case. Defendants ask the Court to look to *Environmental Protection Information Center v. Simpson* ("*EPIC*") and *Sierra Club v. Babbit*. 255 F.3d 1073 (9th Cir. 2001); 65 F.3d 1502 (9th Cir. 1995). The "agency action" in both *EPIC* and *Sierra Club* involved discrete agreements—an incidental take permit and a right-of-way agreement over federal land, respectively—that gave rise to a private party's rights. Plaintiff relies on *Pacific Rivers Council v. Thomas* and *Cottonwood Environmental Law Center v. U.S. Forest Service*. 30 F.3d 1050 (9th Cir 1994); 789 F.3d 1075 (9th Cir. 2015). The "agency action" in *Pacific Rivers* and *Cottonwood* involved multi-year, comprehensive forest plans over which the federal agency had ongoing, plenary control.

The Clean Water Act, as the parties note, grants "primary" responsibility to the states to design and implement their own water standards, while also reserving to EPA a great deal of ongoing authority over those standards. 33 U.S.C.A. §§ 1251(b), 1313. Thus, the facts before the Court are distinguishable from both *EPIC* and *Pacific Rivers*. The Court need not decide which line of cases most closely resembles this case because in all of the cited cases, the

essential question under the ESA is the same, regardless of the character of the agency action at issue: whether the federal agency retains some discretionary involvement or control over the action at issue, such that it has "the ability to implement measures that inure to the benefit of the listed species." *EPIC*, 255 F.3d at 1080, citing *Sierra Club*, 65 F.3d at 1509; *see also Cottonwood*, 789 F.3d at 1087, citing *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024 (9th Cir. 2005) ("[I]t was EPA's discretion to take actions that 'inure to the benefit' of protected species that placed the registrations within the ambit of Section 7."); *Id*., citing *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 784 (9th Cir. 2014) ("Whether an agency must consult does not turn on the degree of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat."). Whether the involvement or control is authorized by the enabling statute, or is retained in a contract with a private party, is not the determining issue before this Court. Moreover, as both *EPIC* and *Cottonwood* make clear, the "agency action" cannot be defined, as EPA urges, as the discrete moment of approval. *See, e.g., Cottonwood*, 789 F.3d at 1086 ("[T]here is nothing in the ESA or its implementing regulations that limits reinitiation to situations where there is 'ongoing agency action.'"); *EPIC*, 255 F.3d at 1080 (looking to "various permit documents" to determine whether agency retained authority "to make *new requirements* to protect species that subsequently might be listed as endangered or threatened") (emphasis added).

Thus, the question here is whether EPA retains discretionary involvement or control over its approval of the sediment management standards such that in the event a jeopardy to a listed species arises, EPA has authority to take action that will inure to the benefit of that species. To answer that, the Court need look no further than the Federal Defendants' own internal documents construing the EPA's ongoing discretionary involvement and control under the CWA. *See, e.g.,* "Memorandum of Agreement," Fish and Wildlife Serv., 66 Fed. Reg. 11,202-01 (2001); "Policy Memo on Water Quality Standards," Third Knutsen Decl., Ex. 3.

These documents contain explicit, unequivocal statements by the agencies that the CWA authorizes EPA to remain involved in both the drafting and implementation of state water quality standards, even after a state gains EPA's approval, including for the specific purpose of protecting a listed species. *Id*.

In particular, the Conservancy refers the Court to a "Memorandum of Agreement Between the Environmental Protection Agency, Fish and Wildlife Service and National Marine Fisheries Service Regarding Enhanced Coordination Under the Clean Water Act and Endangered Species Act" ("MOA"), a document that was "designed to enhance coordination between our agencies so that we can best carry out our responsibilities under the CWA and ESA." 66 Fed. Reg. at 11,203. Perhaps most damaging to Defendants' position is the single observation, made in response to public commentary, that could hardly be more on point: "EPA and the Services have agreed that where information indicates an existing standard is not adequate to avoid jeopardizing listed species, or destroying or adversely modifying designated critical habitat, EPA will work with the State/Tribe to obtain revisions in the standard or, if necessary, revise the standards through the promulgation of federal water quality standards under section 303(c)(4)(B) of the CWA." *Id*. at 11,206. In addition, the agencies *rejected* public comments on the draft MOA that "it is not appropriate for EPA to compel a State to reopen an existing water quality standard to avoid "jeopardy" because that threshold is not contained in the CWA, and nothing in the CWA requires that water quality be improved whenever doing so would benefit listed species." *Id*. In response, the agencies reiterated that "water-dependent endangered and threatened species are an important component of the aquatic environment that the CWA is designed to protect, and steps to ensure the protection of those species are well within the scope of the CWA." *Id*.

Additional provisions from the MOA more fully outline this ongoing "discretionary involvement" over approved standards. They include the following excerpts from the MOA:

- "[T]he MOA [does not] call[] for States and Tribes to "consult" with the Services under section 7 of the ESA. . . . The MOA cannot, and does not, impose any requirements of section 7 on States and Tribes. Those requirements apply solely to Federal agencies, and EPA continues to be responsible for fulfilling any applicable requirements of section 7 [of the ESA] in its administration of the CWA." 66 Fed. Reg. at 11,203.

- "[W]e agree with the comment that the MOA should put greater emphasis on the development of programs by EPA, in consultation with the Services, for the conservation of listed species under section 7(a)(1) of the ESA. The CWA is a powerful vehicle for improving the quality of the aquatic environment on which many endangered and threatened species depend. EPA's mission under the CWA includes reducing the risks to aquatic life and wildlife due to water quality degradation. Reducing those risks can also help facilitate the recovery of listed species. While the MOA will help ensure that EPA actions meet the substantive requirements of section 7(a)(2) of the ESA, we believe the MOA should also help identify affirmative steps under section 7(a)(1) of the ESA that EPA can take pursuant to its CWA authorities to facilitate the recovery of listed species." *Id*. at 11,204.

- "We have also retained in the final MOA an oversight panel that will consist of regional and headquarters personnel to provide oversight and coordination on all aspects of the agreement. In addition, we have amended the draft MOA to specify that the oversight panel, with input from the regional review teams will conduct a 'proactive conservation review' [under the ESA]." *Id*.

- "The draft MOA indicated that EPA would propose to amend EPA's water quality standards regulations to provide that water quality shall be not likely to jeopardize the continued existence of a listed species. We stated that such a rule would essentially codify existing protection for endangered and threatened species under the CWA since water quality that is so poor it would likely jeopardize a listed species or destroy or adversely modify critical habitat fails to meet the fundamental requirements of the CWA." *Id*.

In light of these statements, EPA's current position in this litigation—that it doesn't retain "discretionary involvement" in its approval of Washington's 1996 revisions to the extent that it could take action, if necessary, to benefit listed species—is unsupportable. The MOA demonstrates that in the event a consultation with NMFS were to reveal a potential jeopardy, EPA has the authority to confer with a state on standards EPA has approved; to unilaterally revise that state's standards in the event the state refused to do so; and even, EPA claims, to revise criteria enumerated in the regulations for deciding whether to approve or disapprove

proposed standards in the first place. *Id*. at 11,205. (EPA could "revise the criteria if it determines that more stringent criteria were in fact needed to protect endangered and threatened species."). While it is true that the CWA grants individual states a great deal of discretion in implementing water standards, it is undeniable that the statute also reserves substantial "discretionary involvement and control" for EPA. The Court is unable to discern a reasonable, material distinction between the involvement and control outlined in EPA's own documents, and the ability to "revisit" an approval that EPA now disclaims in this litigation.

Other EPA documents confirm EPA's understanding of its own authority under the CWA to continue to influence state water quality standards to the benefit of listed species, even after the approval process is complete. The "Policy Memo on Water Quality Standards Approvals and Endangered Species Act (ESA) Consultations" was intended as a guide for circumstances in which EPA has approved a standard but explicitly reserved the right to revise the approval pending the results of an ESA consultation—a situation that is not presented here. The memo indicates, however, that "[a]s a general matter," EPA has the authority to make use of the "full range of options available under Section 303(c) of the CWA for ensuring water quality standards are protective of threatened and endangered species," including "work[ing] with the State or authorized Tribe to obtain revisions to the standards in the next triennial review . . . [or] facilitat[ing] a more narrow set of revisions to the standards in the short term." Third Knutsen Decl., Ex. 3 at 3. The memo emphasizes that EPA should "make [] clear" that "EPA approval of water quality standards is not irreversible or irretrievable because the Agency retains substantial discretion to revise its decision based on the results of the consultation," and "[i]f clear and compelling information from the consultation indicates more immediate action is necessary to prevent a loss of threatened or endangered species, EPA can make a determination under CWA Section 303(c)(4)(B) that a revised or new standard is necessary" or change an approval to a disapproval. *Id*. The memo does not reflect a position that this discretion exists only under limited circumstances, as Defendants argue; it directs its

21

water division directors to "make clear" that the authority over a prior approval exists "as a general matter."

Taken together, the MOA and Policy Memo clearly demonstrate EPA's ongoing "discretionary involvement" in state water quality standards under the CWA—including standards it has already approved—and EPA's explicit reservation of the right to influence those standards for the benefit of listed species. These documents confirm that EPA is not limited to sitting helplessly by if a consultation were to reveal that in fact EPA's approval of Washington's revisions may adversely affect listed species. The Agency—in its own estimation—has a host of options at its disposal, ranging from "working with" Washington to develop new standards, to promulgating new regulations governing the CWA approval process. Defendants object that these documents are not statutes or regulations. They clearly reflect, however, the reasonable construction of statutes and regulations, by the agencies charged with their implementation. The Court is bound to defer to these determinations. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 647 (2007).

Consistent with the standard articulated in the case law and with the Federal Defendants' own interpretations of the governing laws, the Court holds that EPA retains the requisite "discretionary involvement and control" over its approval of Washington's sediment management standards such that, in the event one or more of the triggering events listed in the ESA regulations occurs, EPA has the duty to reinitiate consultation. Defendants' request to dismiss Plaintiff's Second and Third Causes of Action on this basis is denied.

E. NMFS Has the Authority to Reinitiate Consultation

Finally, Defendants argue that Plaintiff's Third Cause of Action must be dismissed because whatever may be the obligations of EPA to reinitiate consultation, NMFS has, at most, authority only to "request" a consultation—a request that EPA is free to ignore. The regulation outlining the duty to reinitiate consultation, as referenced above, provides "[r]einitiation of

22

formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law" and one of four triggering events occurs. 50 C.F.R. § 402.16.

Because by its plain language the provision that obligates EPA to reinitiate consultation applies equally to NMFS, and because this question appears to be amply settled in this Circuit, the Court denies Defendants' motion to dismiss Plaintiff's Third Cause of Action on this basis as well. *See Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv*., 230 F. Supp. 3d 1106, 1116–17 (N.D. Cal. 2017) ("While the federal agencies' arguments might be compelling if this was an issue of first impression, the Ninth Circuit has already addressed this precise issue multiple times and confirmed that both the action agency and the consulting agency have a duty to reinitiate consultation."), *citing Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008) ("The duty to reinitiate consultation lies with both the action agency and the consulting agency."); *Gifford Pinchot Task Force v. USFWS*, 378 F.3d 1059, 1076–77 (9th Cir. 2004) (holding that discovery of new facts "mandates reinitiating formal consultations" and that "[the consulting agency] was obligated to reinitiate consultation"); *EPIC*, 255 F.3d at 1076 ("The duty to reinitiate consultation lies with both the action agency and the consultation agency."); *see also Pacificans for a Scenic Coast v. Cal. DOT*, 204 F.Supp.3d 1075, 1093 (N.D. Cal. 2016) ("Consistent with the plain text of [50 C.F.R. Section 402.16], the Ninth Circuit has stated that the duty to reinitiate consultation lies with both the action agency and the consulting agency. . . . The federal defendants' effort to distinguish this clear precedent is wholly unpersuasive. Formal consultation is a collaborative process that requires the participation of both the Bureau and NMFS. The purpose of reinitiating formal consultation is not simply to check off a procedural box, but to complete a formal consultation process that ensures to the extent possible that there are no substantive violations of the ESA. Both the NMFS and Bureau have a clear obligation to participate in and complete this reinitiation process. As the Ninth Circuit has already held, '[t]he duty to reinitiate consultation lies with

both the action agency and the consulting agency.' The defendants' claim that a reinitiation claim is not cognizable against NMFS fails."), *citing Salmon Spawning*, 545 F.3d at 1229. Whether or not these statements are *dicta*, as Defendants claim, the overwhelming weight of authority is that the consulting agency's duty to reinitiate consultation is coterminous with that of the action agency, and Defendants have not cited a single case holding to the contrary. The Court denies Defendants' motions to dismiss Plaintiff's Third Cause of Action as well.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Federal Defendants' Motion for Judgment on the Pleadings. The Court also DENIES Defendant-Intervenor's Motion to Dismiss.

Signed this 7th day of August, 2018.


Barbara Jacobs Rothstein
U.S. District Court Judge